# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 9, 2006    Decided August 15, 2006

No. 05-1087

EARTHLINK, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

BELLSOUTH CORPORATION, ET AL.,
INTERVENORS

On Petition for Review of an Order of the
Federal Communications Commission

---

*Mark J. O'Connor* argued the cause for petitioner. With him on the briefs were *Donna N. Lampert* and *Jennifer L. Phurrough*.

*Nandan M. Joshi*, Counsel, Federal Communications Commission, argued the cause for respondent. On the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, *Samuel L. Feder*, General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Associate

General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel.

*Scott H. Angstreich* argued the cause for intervenors BellSouth Corporation, et al. in support of the respondent. With him on the briefs were *Michael K. Kellogg, Mark L. Evans, Geoffrey M. Klineberg, Sean A. Lev, Michael E. Glover, Edward Shakin, James D. Ellis, Gary L. Phillips*, and *Bennett L. Ross*.

Before: SENTELLE and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Traditionally (if that can be said of anything in the information age), many internet users lumbered along via dial-up connections over standard copper phone lines. Increasingly, however, broadband internet service is becoming available, providing significantly higher access speeds. Two of the most widespread methods of delivering broadband service are digital subscriber line (DSL), which utilizes the high-frequency portion of copper lines, and cable modem service. Other technologies, such as fiber optics, are steadily gaining ground.

In the case before us, the Federal Communications Commission (FCC) agreed not to require the Bell Operating Companies (BOCs) to provide their competitors with "unbundled" access to certain fiber-based network facilities. *See* 47 U.S.C. § 271(c)(2)(B). EarthLink, Inc., an internet service provider that benefits from such unbundling, challenges the FCC's order. Persuaded that the agency's interpretation and application of the statutory scheme are permissible, we deny the petition for review.

3

I

Until the 1990s, local telephone companies operated as monopolies. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999); *AT&T Corp. v. FCC*, 220 F.3d 607, 610 (D.C. Cir. 2000). The local exchange carriers in a given area owned "the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *Iowa Utils. Bd.*, 525 U.S. at 371. Congress passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ("the Act") (amending the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*), to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." *U.S. Telecom Ass'n v. FCC*, 290 F.3d 415, 417 (D.C. Cir. 2002) (*USTA I*) (quoting Act pmbl.) (internal quotation marks omitted).

Under 47 U.S.C. § 251, the FCC has authority to require incumbent local exchange carriers (ILECs) to provide access to their network facilities and capabilities on an "unbundled" basis to competitive local exchange carriers (CLECs). *Id.* § 251(c)(3), (d)(2). In determining what unbundled network elements must be made available, the FCC considers "at a minimum, whether . . . the failure to provide access . . . would impair the ability of the [CLEC] to provide the services that it seeks to offer." *Id.* § 251(d)(2)(B); *see id.* § 153(29) (defining "network element" as "a facility or equipment used in the provision of a telecommunications service").

The Act also contains provisions applicable specifically to the BOCs (a subset of ILECs), allowing them to enter long distance markets forbidden to them under the antitrust consent

decree that broke up AT&T in the early 1980s. *See AT&T*, 220 F.3d at 610-12. Under 47 U.S.C. § 271, BOCs seeking to provide certain long-distance services—namely, in-region "interLATA services"[1]—must obtain permission from the FCC, *id.* § 271(d)(1), premised upon, among other things, the BOC's compliance with a "[c]ompetitive checklist," *id.* § 271(c)(2)(B). Checklist items four through six and ten require BOCs to provide unbundled access to local loops, local transport, local switching, and call-related databases. *Id.* § 271(c)(2)(B)(iv)-(vi), (x). These particular obligations are independent of any unbundling required by § 251. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004) (*USTA II*); *cf.* 47 U.S.C. § 271(c)(2)(B)(ii) (incorporating by reference the unbundling requirements of § 251(c)(3)).

Notwithstanding the foregoing, under 47 U.S.C. § 160, the FCC must forbear from applying a given provision of the Communications Act to a telecommunications carrier "in any or some of its . . . geographic markets," if three conditions are met: (1) enforcement is not necessary to ensure that charges and practices are just, reasonable and non-discriminatory; (2) enforcement "is not necessary for the protection of consumers"; and (3) forbearance "is consistent with the public interest." *Id.* § 160(a).[2] As to the third prong, the FCC "shall consider

---

[1] *See* 47 U.S.C. § 153(21) (defining "interLATA service" as "telecommunications between a point located in a local access and transport area and a point located outside such area"); *id*. § 271(b)(1) ("in-region" refers to services that originate within the BOC's geographic region).

[2] 47 U.S.C. § 160(a) and (b):

(a) Regulatory flexibility[.] . . . [T]he [FCC] shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or

whether forbearance . . . will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services." *Id.* § 160(b). Telecommunication carriers may petition for forbearance and, if the FCC declines to act within a year (subject to a 90-day extension), the petition is deemed granted as a matter of law. *Id.* § 160(c).

Furthermore, section 706 of the Act sets forth the following

---

class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the [FCC] determines that--

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

(b) Competitive effect to be weighed[.] In making the determination under subsection (a)(3) of this section, the [FCC] shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the [FCC] determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a[n] [FCC] finding that forbearance is in the public interest.

overarching direction:

> The [FCC] . . . shall *encourage the deployment* on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by *utilizing . . . regulatory forbearance*, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

Act § 706(a) (emphasis added) (reproduced at 47 U.S.C. § 157 note); *see* Act § 706(c)(1) (defining "advanced telecommunications capability" as "high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology").

## A

In 2003, in its *Triennial Review Order*, the FCC attempted to implement the unbundling requirements of § 251(c)(3). *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16,978 (2003) (*Triennial Review Order*).[3] In pertinent part, the agency relieved those obligations on a nationwide basis with respect to certain new fiber broadband network elements. Specifically, the FCC did not require ILECs unbundle fiber-to-the-home (FTTH) loops (*i.e.*, loops extending from the ILEC's central office all the way to the customers' premises) in places where fiber loop plant had not previously existed: "greenfield" situations (*i.e.*, new residential areas where no lines had existed) and "overbuild" situations (*i.e.*, locations where only copper loop plant was in place). *Id.* at 17,142. In the latter, however, if the ILEC decides to retire the

---

[3] The FCC's prior attempts were unsuccessful. *See Iowa Utils. Bd.*, 525 U.S. 366; *USTA I*, 290 F.3d 415.

incumbent copper loops, it must then make its fiber loops available—albeit only for narrowband, not broadband uses. *Id*. The FCC also declined to require unbundling as to the "next generation network, packetized capabilities" of hybrid loops (*i.e.*, loops comprised only partially of fiber) and "packet-switching." *Id*. at 17,149, 17,321.

In the agency's view, balancing the costs and benefits of unbundling, with particular attention to incentivizing new fiber investment by both ILECs and CLECs, the scales tipped against mandating unbundling. *See, e.g., id*. at 17,121-22, 17,141-53. The FCC emphasized that its "obligation to ensure the deployment of advanced telecommunications capability under section 706 warrants different approaches with regard to existing [copper] loop plant and new [fiber] loop plant." *Id.* at 17,126.

In *USTA II*, while vacating much of the *Triennial Review Order*, we upheld the FCC's nationwide decision to refrain from requiring § 251 unbundling as to the fiber broadband elements described above. *USTA II*, 359 F.3d at 578-87. The FCC had reasonably determined, for example, that "any damage to broadband competition from denying unbundled access to the broadband capacities of hybrid loops is likely to be mitigated by the availability of loop alternatives or intermodal competition." *Id*. at 582. As to the latter, we noted that cable companies, having roughly a 60% share of the nationwide broadband market, provided "robust intermodal competition" to ILECs, which occupied a secondary market position. *Id.*

Furthermore, we held that the FCC "reasonably interpreted § 251(c)(3) to allow it to withhold unbundling orders, even in the face of some impairment, where such unbundling would pose excessive impediments to infrastructure investment," *id*. at 580, because "[s]ection 706(a) identifies one of the Act's goals beyond fostering competition piggy-backed on ILEC facilities,

namely, removing barriers to infrastructure investment," *id.* at 579. Even if the FCC's judgment "entails increasing consumer costs today in order to stimulate technological innovations," we opined, "there is nothing in the Act barring such trade-offs." *Id.* at 581. That is, FCC may weigh the "costs of unbundling" (e.g., investment disincentives) against the "benefits of removing this barrier to competition." *Id.* at 579 (discussing hybrid loops); *see id.* at 583 ("[T]he [section] 706 considerations . . . are enough to justify the [FCC's] decision not to unbundle FTTH.").

In turn, we found reasonable the FCC's conclusion that requiring unbundling of the elements at issue would, indeed, produce undesirable incentives as it is "likely to delay infrastructure investment, with CLECs tempted to wait for ILECs to deploy FTTH and ILECs fearful that CLEC access would undermine the investments' potential return." *Id.* at 584. Accordingly, we upheld the FCC's refusal to unbundle the broadband fiber elements, "even in the face of some CLEC impairment, in light of evidence that unbundling would skew investment incentives in undesirable ways and that intermodal competition from cable ensures the persistence of substantial competition in broadband." *Id.* at 585.

After we decided *USTA II*, the FCC extended the same § 251 unbundling relief to fiber-to-the-curb (FTTC) loops (*i.e.*, hybrid loops in which fiber runs nearly, but not all the way, to the customers' premises) and loops to multi-dwelling units. *Triennial Review Order*, Order on Reconsideration, 19 F.C.C.R. 20,293 (2004); *Triennial Review Order*, Order on Reconsideration, 19 F.C.C.R. 15,856 (2004).

B

The BOCs filed four petitions—one each for Verizon;[4] AT&T Inc. (formerly SBC Communications, Inc.);[5] Qwest Communications International, Inc.; and BellSouth Telecommunications, Inc.—seeking forbearance under § 160 from the additional unbundling requirements of § 271.[6] After consolidating the petitions, the FCC, in the *Order* under review here, agreed to forbear from applying § 271's independent unbundling obligations to the broadband elements that the FCC had previously "relieved from unbundling [on a national basis] under [§] 251: FTTH loops, FTTC loops, the packetized functionality of hybrid loops, and packet switching." *Petition for Forbearance of the Verizon Telephone Companies Pursuant to 47 U.S.C. § 160(c)*, 19 F.C.C.R. 21,496, ¶ 12 (2004) (*Order*).

At the outset, the FCC made clear that its forbearance analysis is "informed" by section 706's mandate to encourage deployment of broadband services. *Id.* ¶ 20 (citing Act pmbl., § 706; *Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*, 13 F.C.C.R. 24,012, 24,047 (1998)

---

[4] For simplicity, "Verizon" refers to the Verizon telephone companies—the local exchange carriers affiliated with Verizon Communications, Inc.

[5] In 2005, SBC Communications acquired AT&T Corp. (forming AT&T Inc.).

[6] Upon being divested by AT&T as required by the 1982 consent decree, the BOCs were consolidated into seven regional holding companies and, due to mergers, that number has since dropped to four. *See Ass'n of Commc'ns Enters. v. FCC*, 235 F.3d 662, 663-64 (D.C. Cir. 2001); *AT&T*, 220 F.3d at 610-11. There might soon be only three. *See* Dionne Searcey *et al.*, *A Reborn AT&T to Buy BellSouth*, WALL ST. J., Mar. 6, 2006, at A1.

(discussing the relationship between § 160 and section 706)). Through that prism, the FCC then applied § 160(a)'s tripartite inquiry, determining that unbundling the broadband fiber elements is not necessary either to ensure just and reasonable rates or to protect consumers, and that forbearance is in the public interest. *Id.* ¶¶ 19-36. The FCC's analysis was similar for all three prongs, balancing short-term competitive effects and future developments. *See, e.g., id.* ¶ 31 ("[T]he [FCC] lawfully may focus on future consumer benefits anticipated by its current policy decisions." (citing *USTA II*, 359 F.3d at 581)).

The FCC acknowledged the important role that competition plays in ensuring reasonable rates, protecting consumers, and furthering the public interest. *Id.* ¶¶ 24, 30, 33; *see also* 47 U.S.C. § 160(b). The agency determined, however, that the BOCs have only "limited competitive advantages" in the market. *Id.* ¶ 30. Considering the "wholesale market in conjunction with competitive conditions in the downstream retail broadband market," the FCC looked to several factors, including the emerging nature of the broadband market, in which "the preconditions for monopoly are not present"; the fact that cable modem providers, not ILECs, "control a majority of all residential and small-business lines"; the expected rise of other intermodal broadband competition, such as fixed wireless, satellite, and broadband over powerline; and the CLECs' continued ability to compete in the broadband market by deploying their own fiber loops or accessing ILECs' legacy copper elements. *Order* ¶¶ 21-23. Ultimately, the FCC concluded that any short-term effects on competition are offset by the prospect of additional intermodal competition and the benefits that forbearance will provide: incentives for both ILECs and CLECs to invest in and deploy broadband facilities, which will increase competition going forward and thereby keep rates reasonable, benefit consumers, and serve the public interest.

EarthLink, an internet service provider that relies on CLECs and ILECs (including the BOCs) for last-mile access to consumers, petitions for review of the *Order*. Verizon, AT&T and BellSouth intervene in support of the FCC.

II

EarthLink raises a number of challenges to the FCC's interpretation and application of the statutory forbearance provision. We conclude the FCC's decision (1) survives *Chevron* analysis, (2) is neither arbitrary nor inconsistent with FCC precedent, and (3) is supported by the record.

A

First, EarthLink argues the *Order* runs afoul of § 160(a). We examine the FCC's interpretation under the familiar *Chevron* framework. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 507 (D.C. Cir. 2003). First, if the statute unambiguously controls the "precise question at issue," then we need go no further. *Chevron*, 467 U.S. at 842-43. Second, where the agency exercises delegated authority to resolve statutory ambiguity, we will uphold the FCC's interpretation as long as it is reasonable, *see id*. at 843-44, even if "there may be other reasonable, or even more reasonable, views," *AT&T*, 220 F.3d at 621 (internal quotation marks and citation omitted). *See also AT&T Corp. v. FCC*, 349 F.3d 692, 698-99 (D.C. Cir. 2003) ("*Chevron* deference is due . . . only if the agency has acted pursuant to 'delegated authority' and the agency action has the 'force of law.'" (citations omitted)).

According to EarthLink, the statute permits the FCC to grant forbearance only after a "painstaking analysis of market conditions" in "particular geographic markets and for specific

telecommunications services." We disagree. On its face, the statute imposes no particular mode of market analysis or level of geographic rigor. *See* 47 U.S.C. § 160(a) (requiring forbearance in "any or some of [a carrier's] geographic markets" if three conditions are met). Seizing on the phrase "geographic markets" in § 160(a), EarthLink contends the decision to forbear on a nationwide basis—without considering more localized regions individually—is *per se* improper. This argument is tenuous, at best. In context, the language simply contemplates that the FCC might sometimes forbear in a subset of a carrier's markets; it is silent about how to determine when such partial relief is appropriate. Similarly, the statute does not require consideration of specific services. *See id.* (permitting forbearance as to a "*class* of telecommunications carriers or telecommunications services" (emphasis added)). Instead, we are persuaded the agency reasonably interpreted the statute to allow the forbearance analysis to vary depending on the circumstances.

Insofar as EarthLink suggests the statute does not permit the FCC to make the forbearance decision with an eye to the future—by accounting for section 706's goals and assessing likely market developments—the argument also fails.[7] Nothing in § 160 prohibits weighing such considerations in assessing the impact of forbearance on rates, consumers, and the public interest. *See* 47 U.S.C. § 160(a)(1), (2), (3); *id.* § 160(b).

---

[7] *See, e.g.*, Petitioner's Br. 34-35 (FCC cannot rely on "'investment disincentives' to justify forbearance" because § 160(a)(1) "does not permit the FCC either to ignore or counterbalance" the short-term effect on "'rates and charges' in order to accommodate other goals, even worthy goals such as broadband deployment"); *id.* at 36 (FCC cannot conclude "'the protection of consumers' is adequately addressed in the here and now by the promise of future alternatives broadband networks yet to be built").

Further, section 706 explicitly directs the FCC to "utiliz[e]" forbearance to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." As the precise interplay between section 706 and the three-part forbearance inquiry is not self-evident from the text, it is precisely the type of ambiguity entrusted to reasonable agency construction. The language of section 706 suggests a forward-looking approach and, reading the two statutory provisions together, we cannot fault the FCC for interpreting it to inform the § 160 analysis.

This conclusion finds support in *USTA II* where we held that the FCC properly considered section 706's goals in deciding not to require § 251 unbundling. *See* 359 F.3d at 579-80 (interpreting § 251(d)(2)'s "at a minimum" clause). We rejected the argument that the Act prohibits "'ad hoc' balancing of the statute's pro-competition goals with an allegedly conflicting goal derived from [section] 706," holding instead that "[s]ection 706(a) identifies one of the Act's goals beyond fostering competition piggy-backed on ILEC facilities, namely, removing barriers to infrastructure investment." *Id.* at 579. Similar trade-offs are also reasonably incorporated into a decision to forbear from § 271 unbundling. While the FCC's prior decision to relieve § 251 unbundling does not automatically make it proper to forbear from the separate § 271 unbundling requirements, the FCC permissibly construed the statutory scheme to permit weighing similar considerations in each case.

B

Next, EarthLink argues the *Order* "arbitrarily assessed broadband competition in an irrational and *ad hoc* manner." We review the FCC's application of the Act pursuant to the deferential "arbitrary and capricious" standard. *See Cellular Telecomms. & Internet Ass'n*, 330 F.3d at 507-08; 5 U.S.C.

§ 706(2)(A). Our role in this regard is a limited one and we will not substitute our judgment for that of the agency. *Cellular Telecomms. & Internet Ass'n*, 330 F.3d at 507. We must ensure the FCC has "considered the relevant factors and 'articulate[d] a rational connection between the facts found and the choice made.'" *AT&T*, 220 F.3d at 616 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). We will reverse "only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment"; indeed, an extra measure of deference is warranted where the decision involves a "high level of technical expertise" in an area of "rapid technological and competitive change." *Id*. (internal quotation marks and citations omitted).

Similar to its statutory interpretation argument, EarthLink contends "competition" can only rationally be assessed by focusing on more specific product and geographic markets and by conducting a "traditional market analysis (including market share, demand and supply elasticity, and other factors)." While such an analysis is no doubt appropriate in some circumstances, we cannot say the FCC was unreasonable in taking another tack here, tailoring the forbearance inquiry to the situation at hand.

Given the FCC's view of the broadband market as still emerging and developing, it reasonably eschewed a more elaborate snapshot of the current market in deciding whether to forbear with respect to the fiber network elements at issue here. *Cf. Inquiry Concerning High-Speed Access to the Internet over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4847-48 (2002) (suggesting forbearance from common carrier regulations would be proper on a nationwide basis with respect to cable-modem service). Guided by section 706, the agency decided to balance the future benefits against short term impact. *Cf. Petition of U.S. West Commc'ns, Inc. for a Declaratory Ruling Regarding the*

*Provision of Nat'l Directory Assistance*, 14 F.C.C.R. 16,252, 16,277 (1999) (basing forbearance decision in part on whether "pro-consumer benefits . . . outweigh any potential competitive advantage that may accrue" to the carrier requesting forbearance). The FCC then appropriately stepped through the three-part forbearance inquiry, at each step explaining its view that forbearance would only have a "modest" impact that was outweighed by forward-looking benefits (increased competition and fiber deployment).

Nor is the *Order* inconsistent with FCC precedent. The decisions proffered by EarthLink are not directly applicable to the present circumstances; for example, many of them address dominant carrier regulation rather than unbundling requirements, *see, e.g.*, *WorldCom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001) (noting, in dicta, that the FCC requires a "painstaking analysis of market conditions" when "an LEC seeks classification as a non-dominant carrier or the forbearance of dominant carrier regulation"); *AT&T Corp. v. FCC*, 236 F.3d 729, 735-36 (D.C. Cir. 2001) (explaining that, in making dominance classifications, FCC's traditional market power inquiry looks to factors such as carrier's market share, supply and demand elasticity, and carrier's cost structure, size and resources), or are otherwise distinguishable, *see, e.g.*, *Applications for Consent to the Transfer of Control of Licensees and Section 214 Authorizations by Time Warner Inc. and America Online, Inc., Transferors, to AOL Time Warner Inc., Transferee*, 16 F.C.C.R. 6547, 6578 (2001) (finding, in *merger* analysis, the "relevant geographic markets for residential high-speed Internet access services are local").

EarthLink's reliance on *Qwest Omaha*, a post-*Order* decision, is particularly inapt as that case highlights the FCC's capacity and propensity to adapt forbearance decisions to the circumstances. *Petition of Qwest Corp. for Forbearance*

*Pursuant to 47 U.S.C. § 160(c) in the Omaha Metro. Statistical Area*, 20 F.C.C.R. 19,415 (2005) (*Qwest Omaha*). First, while the FCC acknowledged that a decision to forbear from dominant carrier regulation is "informed by the [FCC's] traditional market power analysis," *id.* at 19,425, the agency was quick to note that such analysis "does not *bind* [the FCC's § 160] forbearance analysis," *id.* at 19,425 n.52 (emphasis added) (citing *AT&T Corp.*, 236 F.3d at 736-37). Second, when addressing forbearance from §§ 251 and 271, the FCC did not invoke its "traditional market power" analysis, *see, e.g.*, *id*. at 19,443-19,470, instead noting at one point that the FCC's "*unbundling* analysis" is "instructive for purposes of rendering [its § 160(a)] determination," *id*. at 19,446 (emphasis added). Third, in denying forbearance from § 271, *Qwest Omaha* specifically distinguished the *Order*:

> The reasoning that formed the basis of the [FCC's] decision [in the *Order*] to forbear from applying the [§] 271 network access requirements to certain of the BOCs' broadband facilities does not extend to . . . legacy elements. The supply market for legacy services is quite different from the supply market for broadband services. As explicitly recognized in section 706, it is important for [the FCC] to remove investment disincentives that apply to broadband services in order to encourage the construction of next generation facilities to customers nationwide. In contrast, the policies of section 706 do not apply to already-constructed legacy elements.

*Id.* at 19,469. Thus, insofar as the later *Qwest Omaha* decision is relevant at all, *cf. AT&T Inc. v. FCC*, 452 F.3d 830, 839 (D.C. Cir. 2006) (examining subsequent agency action to show pattern of arguably inconsistent decisionmaking), it lends credence to the FCC's action in the present matter.

In sum, EarthLink pointed to no case speaking directly to

the present circumstances, and we find no "abrupt departure" from FCC precedent. *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42; *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed . . . ."). Rather, the agency reasonably tailored its analysis to the situation at hand.[8]

C

Finally, the record supports the FCC's forbearance determination. Given the FCC's forward-looking interpretation and application of the statute, the agency only needed to show that the positive short-term impact of unbundling would be outweighed by the longer-term positive impact that *not* unbundling

---

[8] Various related arguments warrant little discussion. EarthLink contends that "the FCC proffered [§] 271 unbundling as an effective backstop for competitors in light of the [*Triennial Review Order*'s] elimination of [§] 251 unbundling." However, in the passage EarthLink cites in support, the FCC merely concluded that § 271 obligations are independent from those in § 251, *not* that the former must remain in place wherever the latter have been lifted. *See Triennial Review Order*, 18 F.C.C.R. at 17,385-86.

Also, according to EarthLink, the FCC failed to properly consider the wholesale market. Not so. The FCC explained its lack of concern in the wholesale market; in its view, the CLECs have alternate ways to compete and the BOCs will be inclined to offer reasonable wholesale rates because they face "intense intermodal competition" inducing them, "even in the absence of [§] 271 unbundling," to "find ways to keep traffic 'on-net.'" *Order* ¶ 26; *see also id.* ¶ 28 (rejecting argument that "a fully competitive wholesale market is a mandatory precursor" to forbearance).

would have on rates, consumers, and the public interest. The record here is up to the task.

The FCC reasonably concluded the benefits of unbundling were "modest," pointing to, among other things, evidence of intermodal competition indicating that cable modem service—not ILECs—is the nationwide broadband market leader with a solid majority. *See, e.g.*, *Order* ¶ 22 (citing Industry Analysis and Technology Division, FCC, *High-Speed Services for Internet Access: Status as of June 30, 2003*, tbls. 3, 4 (Dec. 2003)). Indeed, the FCC relied on a report that is a later iteration of the study relied upon in the *Triennial Review Order* to find a sufficiently "competitive environment," 18 F.C.C.R. at 17,151-52—a finding we upheld in resounding terms:

> [W]e agree with the [FCC] that robust intermodal competition from cable providers—the existence of which is supported by very strong record evidence, including cable's maintenance of a broadband market share on the order of 60%—means that even if all CLECs were driven from the broadband market, mass market consumers will still have the benefits of competition between cable providers and ILECs.

*USTA II*, 359 F.3d at 582 (citation omitted). It can hardly be irrational, then, to similarly find sufficient competition in the present case. That is, it is reasonable to conclude that the BOCs' secondary market position relative to cable internet providers tends to mitigate the impact of forbearance on the state of competition in the broadband market, especially where cable internet providers themselves are not required to unbundle.

EarthLink's proffered evidence and statistical analysis are not to the contrary and its frantic claim that the *Order* is premised on a "momentous new economic theory"—one that

"reverse[s] decades of communications precedent" by finding that "duopoly now equates to rigorous competition"—misses the mark. The FCC nowhere asserts that cable's majority market share alone is dispositive, only that, in light of the various other circumstances, it lends support to the forbearance decision in the present case.

In the agency's view, "[t]he broadband market is still an emerging and changing market, where, as the [FCC] previously has concluded, the preconditions for monopoly are not present. In particular, actual and potential intermodal competition informs rational competitors' decisions concerning next-generation broadband technologies." *Order* ¶ 22 (footnote omitted). The FCC cited its prior decision in which it elaborated on that thought:

> The facts that different companies are using different technologies to bring broadband to residential consumers and that each existing broadband technology has advantages and disadvantages as a means of delivery to millions of customers opens the possibility of intermodal competition, like that between trucks, trains, and planes in transportation. . . . Anti-competitive coordination among competitors is difficult in such markets.

*Inquiry Concerning the Deployment of Advanced Telecomms. Capability*, 14 F.C.C.R. 2398, 2423-24 (1999) (footnotes omitted) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 238 (1993) ("Tacit coordination is facilitated by a stable market environment, fungible products, and a small number of variables upon which the firms seeking to coordinate their pricing may focus.")); *see also Rulemaking to Amend Part 1, 2, 21, and 25 of the Commission's Rules*, 15 F.C.C.R. 11,857, 11,864-65 (2000). This represents the agency's expert assessment, and we examine "not whether the FCC's

economic conclusions are correct or are the ones that we would reach on our own, but only whether they are reasonable." *In re Core Commc'ns, Inc*., --- F.3d ----, 2006 WL 1789003, at *10 (D.C. Cir. June 30, 2006). We find the FCC's explanation reasonable.[9]

Nor are we given sufficient cause to second-guess the FCC's predictions. "[A]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to *particularly deferential* review, as long as they are reasonable," *id.* at *12 (emphasis added) (internal quotation marks and citation omitted), and need not rest on "pure factual determinations," *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981). *See Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001) ("Substantial evidence does not require a complete factual record—we must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency.").

Here, the FCC's predictions about the development of new broadband technologies and about the incentives for increased deployment (and, in turn, increased competition) flowing from

---

[9] *Cf. W. Coal Traffic League v. Surface Transp. Bd*., 169 F.3d 775, 778-79 (D.C. Cir. 1999) (upholding agency's conclusion that merger would result in "rivalry, not collusion"; agency had explained that "'the outcome where just two companies offer the only significant competitive alternatives in a market may range all the way from intense rivalry to collusion, depending on the circumstances of the industry'" (citation omitted)); *FTC v. H.J. Heinz Co*., 246 F.3d 708, 717 (D.C. Cir. 2001) (stating that where district court found "there had been no significant entries in the baby food market in decades and that new entry was 'difficult and improbable,'" this finding "largely eliminates the possibility that the reduced competition caused by the [three-to-two] merger will be ameliorated by new competition from outsiders" (citation omitted)).

an absence of unbundling are well within the agency's area of expertise. Indeed, they echo predictions made in the *Triennial Review Order* and upheld in *USTA II*. *See, e.g.*, *USTA II*, 359 F.3d at 584 ("Absence of unbundling . . . will give all parties an incentive to take a shot at this potentially lucrative market."); *id*. at 581 (rejecting CLEC's argument that decision rested on "pure speculation"); *Triennial Review Order*, 18 F.C.C.R. at 17,144 (anticipating new technologies); *cf. Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 763 n.4 (6th Cir. 1995) (declining to defer to FCC's predictive judgment about increased competition in cellular market). Moreover, FCC is fully capable of reassessing the situation if its predictions are not borne out. *See Order* ¶ 26 n.84.

EarthLink contends that invocation of the disincentives associated with § 251 unbundling is improper because they are more acute than those associated with § 271 unbundling. Section 251, EarthLink points out, requires ILECs to provide the network elements at cost-based (so-called "TELRIC") pricing, while § 271 operates under the more relaxed "just and reasonable" standard of 47 U.S.C. §§ 201 and 202. *See USTA II*, 359 F.3d at 589-90; 47 U.S.C. § 252(d)(1). Nonetheless, even if unbundling under § 271 would produce marginally less disincentive, the FCC reasonably concluded there would still be a significant deterrent due to costs inherent in complying with any unbundling mandate. *See, e.g.*, *Order* ¶¶ 25, 34.[10]

In sum, the FCC, reasonably weighed present conditions and future developments in determining what is necessary for just and reasonable rates, "necessary for the protection of

---

[10] EarthLink's suggestion that forbearance from § 271 contravenes FCC precedent by denying CLECs the protections of §§ 201 and 202 is meritless. The *Order* granted forbearance as to § 271, not §§ 201 and 202.

consumers," and "consistent with the public interest," 47 U.S.C. § 160(a), and made a "rational connection between the facts found and the choice made." *AT&T Corp.*, 220 F.3d at 616 (internal quotation marks and citation omitted).

## III

For the foregoing reasons, EarthLink's petition for review is

*Denied.*