# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 20, 2009        Decided July 17, 2009

No. 07-1426

AD HOC TELECOMMUNICATIONS USERS COMMITTEE, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T INC., ET AL.,
INTERVENORS

———

Consolidated with 07-1427, 07-1429, 07-1430, 07-1431,
07-1452, 07-1484, 07-1503

———

On Petitions for Review of Orders
of the Federal Communications Commission

———

*Colleen L. Boothby* and *Christopher J. Wright* argued the
cause for private petitioners. With them on the briefs were
*David P. Murray*, *Thomas Jones*, *Randy Branitsky*, *Russell M.
Blau*, *Joshua M. Bobeck*, *Brad E. Mutschelknaus*, *Genevieve
Morelli*, *John J. Heitmann*, *Timothy J. Simeone*, and *Joseph
C. Cavender*.

*Stefanie A. Brand* was on the brief for petitioner the New Jersey Division of Rate Counsel. With her on the briefs was *Ronald K. Chen* and *Christopher J. White*.

*Richard K. Welch*, Acting Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Matthew B. Berry*, General Counsel, *Jacob M. Lewis*, Associate General Counsel, and *Laurel R. Bergold*, Counsel. *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, and *James M. Carr*, Counsel, Federal Communications Commission, entered appearances.

*Jonathan E. Nuechterlein* argued the cause for intervenors AT&T Inc., et al. in support of the respondent. With him on the brief were *Lynn R. Charytan*, *Heather M. Zachary*, *Jack S. Zinman*, *Gary L. Phillips*, *Paul K. Mancini*, *Michael E. Glover*, *Edward Shakin*, *William H. Johnson*, *Craig J. Brown*, *Robert B. McKenna*, *David W. Zesiger*, *Scott H. Angstreich*, *Gregory G. Rapawy*, and *Gregg Sayre*.

Before: SENTELLE, *Chief Judge*, and KAVANAUGH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: This case involves the FCC's regulation of "special access" broadband lines that connect individual businesses to their incumbent local exchange carriers. Businesses need dedicated special access lines to utilize essential broadband applications. In many areas, however, only one incumbent local exchange carrier (usually AT&T, Verizon, or Qwest) maintains the special

access lines that connect to individual businesses in that locale. The "last mile" for broadband business customers thus differs from the analogous last mile for residential customers, who typically have at least two wires into their homes over which they can obtain Internet service (namely, their traditional telephone and cable lines). The ILECs' current control of most special access lines into businesses forms the backdrop for the FCC's action in this case.

Applying its statutory forbearance authority, the FCC largely eliminated what the Commission refers to as dominant-carrier pricing regulation with respect to AT&T's special access lines – as well as those of two smaller ILECs, Embarq and Frontier. But at the same time, the FCC maintained basic Title II common-carrier regulation on those ILECs' special access lines, including requirements for interconnection and that ILECs' prices be just, reasonable, and not unreasonably discriminatory.

A coalition of businesses, as well as competitive broadband providers that lease special access lines from the ILECs, argue that the FCC's decision was arbitrary and capricious under the Administrative Procedure Act. They contend that the FCC must continue to impose not just common-carrier regulation but also dominant-carrier pricing regulation on ILECs with respect to their special access lines. We disagree. Applying the deferential arbitrary and capricious standard, we find the FCC's decision to recalibrate the degree of regulation imposed on the ILECs' special access lines to be reasonable and reasonably explained. We therefore deny the petitions for review.

4

I

The background leading to this case is familiar to many, but we recount it briefly. In so doing, we will simplify the story a bit and strive to keep the jargon to a minimum.

Federal communications law historically distinguished telephone systems and cable systems. On the one hand, wireline telecommunications services have been governed by Title II of the Communications Act of 1934, which imposes various common-carrier requirements on telecommunications carriers.

By contrast, cable services have been governed by a separate set of obligations set forth in Title VI of the Act. Cable services have generally been exempt from mandatory common-carrier regulation.

Broadband services do not correspond to the old telephone-cable regulatory divide: A residential customer can obtain high-speed or broadband Internet access over the telephone line through Digital Subscriber Line (DSL) service offered by local "telephone companies," or through cable modem service offered by "cable companies," among other newer alternatives provided by satellite companies and electric companies. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005).

The FCC ultimately decided that services offering the same essential functions to residential customers should not be regulated under different statutory frameworks simply because of the wire used. To harmonize its regulatory approach, the FCC ruled that many common-carrier obligations would not apply to *residential* broadband lines, whether DSL or cable modem. *See Internet Over Cable*

*Declaratory Ruling*, 17 F.C.C.R. 4,798 (2002); *see also Wireline Broadband Order*, 20 F.C.C.R. 14,853 (2005); *see generally Brand X*, 545 U.S. at 973-74; Daniel F. Spulber & Christopher S. Yoo, *Rethinking Broadband Internet Access*, 22 HARV. J.L. & TECH. 1, 16-18 (2008).

Unlike *residential* customers who typically rely on their telephone or cable wires to obtain broadband Internet service, *business* customers ordinarily can obtain essential broadband services[1] only through a dedicated high-capacity special access line owned by an ILEC such as AT&T, Verizon, or Qwest. *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 453 (D.C. Cir. 2001); Lawrence A. Sullivan, *Is Competition Policy Possible in High Tech Markets?: An Inquiry Into Antitrust, Intellectual Property, and Broadband Regulation as Applied to "The New Economy*," 52 CASE W. RES. L. REV. 41, 76 (2001). Because one ILEC usually controls the only special access line to an individual business, there is of course concern that the ILEC might charge unduly excessive rates or improperly discriminate against unaffiliated broadband service providers seeking to lease its lines.

As a starting point, the FCC has determined that Title II pricing and common-carrier regulations largely still apply to the ILECs' special access lines, absent forbearance. *See Wireline Broadband Order*, 20 F.C.C.R. at 14,861, ¶ 9. The issue for the FCC, therefore, has been when and how much to forbear from applying the Title II obligations using its statutory forbearance authority. *See* 47 U.S.C. §§ 160, 1302. To put that choice into context, some overview of Title II and the FCC's regulations is necessary.

---

[1] Those services include Ethernet, Frame Relay, ATM, LAN, Video Transmission, Optical Network, and Wave-Based services.

Title II imposes certain mandatory common-carrier requirements on interstate telecommunications carriers. For example, telecommunications carriers must charge just and reasonable rates. *Id*. § 201(b). Telecommunications carriers must not engage in unreasonable discrimination. *Id.* § 202(a). And telecommunications carriers must allow other carriers to interconnect with their networks. *Id.* § 251(a)(1).

Additional statutory pricing regulation also applies to what the FCC refers to as dominant carriers. As relevant here, dominant carriers are typically subject to rate-of-return regulation or price caps accompanied by stringent tariff advance filing rules, whereas non-dominant common carriers are not. *See id.* §§ 203(b), 204(a)(3); *compare* 47 C.F.R. §§ 61.38, 61.41, 61.58 *with id.* §§ 1.773(a)(ii), 61.23(c).[2]

Title II was enacted in 1934 in part to regulate monopolistic telephone service, at a time when broadband service obviously was not offered. As Congress and the FCC have recognized, regulation of broadband can pose different issues and challenges than regulation of local telephony.

---

[2] The FCC's so-called *Computer Inquiry* rules impose nondiscriminatory access and tariffing requirements on telecommunications carriers providing "enhanced" services – namely those that bundle computer-processing applications with "basic" telephone services. *See Brand X*, 545 U.S. at 976; Scott Blake Harris et al., *Regulating Broadband*, 23 COMM. LAW. 1, 34-35 (Summer 2005). As applied by the FCC, those rules subject telecommunications carriers with greater market power to more stringent obligations. For purposes of this case, we need not discuss the overlapping obligations imposed by the *Computer Inquiry* pricing rules separately from those imposed by the FCC's dominant-carrier pricing regulation: The FCC's decisions to forbear from applying certain dominant-carrier regulations and *Computer Inquiry* requirements rise or fall together.

In 1996, to guide the FCC's regulation of broadband in the residential and business markets, Congress enacted § 706 of the Telecommunications Act, 47 U.S.C. § 1302.

Section 706 directs the Commission to "encourage the deployment" of broadband "on a reasonable and timely basis." Naturally, there are different ideas about the best means to achieve that statutory objective – for example, some advocate a more market-based approach (which would spur more facilities-based competition) and others favor a more common-carrier, equal-access-based approach.

Interestingly, and perhaps not surprisingly given the compromises necessary to reach agreement on such a massive piece of legislation, Congress did not choose between those competing philosophies for broadband regulation. To be sure, the preamble to the Act does say that it is to "promote competition *and reduce regulation*." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996) (emphasis added). But § 706 speaks in very broad terms and instructs the FCC to facilitate broadband deployment "by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." And § 706 mandates that, if broadband capability is not being sufficiently deployed, the Commission "shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market."

The general and generous phrasing of § 706 means that the FCC possesses significant, albeit not unfettered, authority

and discretion to settle on the best regulatory or deregulatory approach to broadband – a statutory reality that assumes great importance when parties implore courts to overrule FCC decisions on this topic.

As contemplated by § 706, the FCC has utilized forbearance from certain Title II regulations as one tool in its broadband strategy. Forbearance decisions are governed by the Communications Act's § 10, codified as amended at 47 U.S.C. § 160, which provides that any telecommunications carrier may file a petition with the FCC requesting that the Commission forbear from applying any Communications Act provisions or FCC rules to specific services. Under § 10, the FCC must grant forbearance if enforcement is unnecessary to ensure that rates and practices are just, reasonable, and not unreasonably discriminatory; enforcement is unnecessary to protect consumers; and forbearance is consistent with the public interest, in that it "will promote competitive market conditions" and "enhance competition among providers of telecommunications services."

Until recently, ILECs such as AT&T, Verizon, and Qwest had been subject to both basic common-carrier *and* dominant-carrier pricing regulation with respect to their special access lines. In 2004, Verizon filed a petition with the FCC seeking forbearance from regulations regarding its provision of certain special access services to business customers.

The Commissioners deadlocked 2-2 on Verizon's petition. The forbearance statute provides that a forbearance petition "shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under [§ 10] within one year" of filing. *Cf. Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1133 (D.C. Cir. 2007)

("deemed granted" disposition of Verizon's forbearance petition unreviewable).

Later in 2006, AT&T and two smaller ILECs, Embarq and Frontier, sought to follow Verizon's lead and filed petitions with the FCC seeking comparable forbearance.[3] As ILECs, they claimed that both dominant-carrier regulation and basic common-carrier requirements were unnecessary and unduly hindered their ability to compete in providing certain specified services over their special access lines.

In 2007, the FCC (now back at full strength with five Commissioners) granted AT&T, Embarq, and Frontier only partial forbearance. *See AT&T Title II and Computer Inquiry Forbearance*, 22 F.C.C.R. 18,705 (2007) (*AT&T Order*); *Embarq and Frontier Title II and Computer Inquiry Forbearance*, 22 F.C.C.R. 19,478 (2007) (*Embarq/Frontier Order*). The FCC's decision granted forbearance from dominant-carrier regulation but not from basic common-carrier regulation. *See AT&T Order*, 22 F.C.C.R. at 18,707, ¶ 2; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,480, ¶ 2. The FCC emphasized that the ILECs, in operating their special access lines, must continue to comply with Title II common-carrier regulation generally applicable to all telecommunications carriers – most importantly, the requirements to allow interconnection and to charge prices that are just, reasonable, and not unreasonably discriminatory.[4]

---

[3] AT&T and BellSouth filed separate forbearance petitions but later merged.

[4] The FCC later similarly resolved a forbearance petition by Qwest, another significant ILEC provider of special access lines.

Several competitor carriers that lease special access lines and a trade association representing broadband business customers challenge the FCC's action. They argue that the FCC should have denied forbearance and maintained dominant-carrier regulation on these three ILECs.

II

Congress has directed the FCC to make the major policy decisions and to select the mix of regulatory and deregulatory tools the Commission deems most appropriate in the public interest to facilitate broadband deployment and competition. Telecommunications Act of 1996, § 706, 47 U.S.C. § 1302.

Our task on review is therefore limited. We review the FCC's action in this case only to ensure that it is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That standard is particularly deferential in matters such as this, which implicate competing policy choices, technical expertise, and predictive market judgments. *See EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006); *see also Time Warner Telecomm., Inc. v. FCC*, 507 F.3d 205, 221 (3d Cir. 2007).

The FCC's forbearance decision in this case readily satisfies the applicable arbitrary and capricious standard of review. The FCC reached a hotly debated and eminently debatable, but ultimately reasonable, conclusion that eliminating the extra layer of dominant-carrier pricing regulation on the ILECs' special access lines – while leaving in place basic Title II common-carrier regulation – will better promote competition and the public interest. We find no legal basis to upset the FCC's policy judgment.

In this Court, petitioners primarily argue that the FCC examined the wrong product market and wrong geographic market when it analyzed competition in *broadband services nationwide*, rather than focusing more precisely on *special access lines in identified local markets*. According to petitioners, the fact that there is competition among broadband business service providers – who generally lease special access lines from ILECs – does not change the fact that the ILECs control most connections to businesses. They suggest, therefore, that the FCC's analysis is equivalent to arguing that there is competition in bus service to a local airport because of competition among the airlines providing air service at the airport.

To begin with, in our recent decision in *EarthLink, Inc. v. FCC*, we rejected a similar argument challenging the FCC's decision to forbear from imposing unbundling obligations on the Bell Operating Companies' broadband services. 462 F.3d at 8. Given the rapidly changing state of the overall broadband market and § 706's direction that the FCC may look to and attempt to shape possible future developments in regulating broadband, we stated that the law does not compel a "particular mode of market analysis or level of geographic rigor" when the agency forbears from imposing certain requirements on broadband providers. *Id.*; *see also Time Warner Telecomm.*, 507 F.3d at 221 (examining FCC's *Wireline Broadband Order* and permitting FCC to "refrain from a traditional market analysis and to rely instead on larger trends and predictions concerning the future of the broadband services market").

Even putting the *EarthLink* precedent aside, petitioners' focus on the narrowest possible market is unavailing in this case. To be sure, petitioners' submission might pack more force had the FCC lifted all common-carrier regulation on the

ILECs' special access lines, thereby potentially allowing ILECs to leverage their control over special access lines into undue control of the broadband business services market (and to presumably squeeze out competitive broadband business service providers). But the FCC did no such thing. Rather, the Commission expressly recognized that ILECs' control of bottleneck special access lines in certain local areas creates the potential for improper exercise of market power. The FCC therefore refused the ILECs' forbearance petitions in part and retained basic Title II common-carrier regulation on the ILECs' special access lines. As the Commission explained, AT&T, Embarq, and Frontier "continue to be subject to sections 201 and 202 of the Act . . . which, among other things, mandate that [the ILECs] provide interstate telecommunications services upon reasonable request and prohibit [the ILECs] from acting in an unjust or unreasonable manner or otherwise favoring particular entities in the provision of 'like' services provided to other entities." *AT&T Order*, 22 F.C.C.R. 18,705, 18,726, ¶ 35 (2007); *Embarq/Frontier Order*, 22 F.C.C.R. 19,478, 19,498, ¶ 34 (2007).

Therefore, the precise issue here is whether the FCC was arbitrary and capricious in concluding that the ILECs, while subject to basic Title II common-carrier regulation, need not also be subjected to dominant-carrier regulation.

For present purposes, the most relevant impact of dominant-carrier regulation is to subject ILECs to price caps, rate-of-return regulation, or FCC approval of its prices and rates – as opposed to a more generic Title II mandate to charge prices and rates that are just, reasonable, and not unreasonably discriminatory. The FCC determined that such additional dominant-carrier obligations on ILECs were "not necessary to ensure" that ILECs' special access charges were

"just, reasonable, and not unjustly or unreasonably discriminatory." *AT&T Order*, 22 F.C.C.R. at 18,723-24, ¶ 30; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,496, ¶ 29. The Commission explained at some length that dominant-carrier regulation – with its requirement that the FCC approve the ILECs' prices and charges – "may create market inefficiencies, inhibit carriers from responding quickly to rivals' new offerings, and impose other unnecessary costs." *AT&T Order*, 22 F.C.C.R. at 18,725, ¶ 33; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,497, ¶ 32. The Commission predicted that eliminating dominant-carrier regulation will increase competition by freeing the ILECs from unnecessary regulation. The "better policy," the FCC said, was to allow the ILECs to "respond to technological and market developments without the Commission reviewing in advance the rates, and terms, and conditions under which [the ILECs offer] these services." *AT&T Order*, 22 F.C.C.R. at 18,725, ¶ 33; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,497, ¶ 32.

To respond to the concern that ILECs might be able to skirt their basic Title II common-carrier obligations to allow interconnection and charge just, reasonable, and not unreasonably discriminatory prices, the FCC pointed out that business end-users and competitive broadband service providers who lease or use the ILECs' special access lines may bring complaints under 47 U.S.C. § 208. Section 208 establishes a formal fast-track process for business end-users and competitive broadband providers to challenge the reasonableness of rates charged by ILECs, among other things. Under § 208, all complaints as to "the lawfulness of a charge, classification, regulation, or practice" will be investigated and resolved within five months. *Id.* § 208(b)(1). In its decision here, moreover, the FCC reiterated its commitment to the five-month mandate for resolution of § 208 complaints. *See AT&T Order*, 22 F.C.C.R. at 18,726,

¶ 36; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,498, ¶ 35. In that regard, it bears mention that competitive broadband business service providers and business customers are sophisticated entities that presumably would not be shy about invoking available remedies if faced with ILECs gouging them.

The FCC's decision also was limited in another important way: The FCC declined to grant forbearance with respect to the ILECs' "TDM-based" DS1 and DS3 special access services – namely, those that use traditional Time Division Multiplexing technology. The FCC granted forbearance from dominant-carrier regulation only with respect to the ILECs' "non-TDM-based" special access services: packet-switched broadband and optical transmission services.[5] This means the following: To the extent ILECs try to abuse their control over special access lines, competitive carriers not only can file § 208 complaints with the FCC but also can obtain access to the ILECs' price-regulated TDM-based services to provide and compete with the ILECs in providing non-TDM-based special access services. All parties concede that it is technically feasible to use TDM-based services in this way, but petitioners argue that it is not *economically* feasible to do so. In advancing this argument, they particularly focus on Ethernet service. As the FCC noted, however, that protest lies in some tension with the evident success of big-time competitive broadband business service providers that use ILECs' TDM-based inputs, as reflected in the record evidence. *See AT&T Order*, 22 F.C.C.R. at 18,721, ¶ 26 & n.109; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,494, ¶ 25 &

---

[5] The specified services include Ethernet, Frame Relay, ATM, LAN, Video Transmission, Optical Network, and Wave-Based services. *See AT&T Order*, 22 F.C.C.R. at 18,713, ¶ 12; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,485-86, ¶ 12.

n. 102. For example, Time Warner Telecom has proclaimed that, by using ILECs' TDM-based special access inputs in areas where it has not deployed its own facilities, it has been able to "affordably" and "cost-effectively deliver our industry-leading Ethernet portfolio to customers anywhere." Press Release, Time Warner Telecom and Overture Networks Provide Ethernet Anywhere (June 6, 2006). Other competitive providers similarly advertise their ability to use DS1 and DS3 circuits to provide broadband services to businesses. *See* Press Release, Deltacom Launches New Ethernet Services Using Overture Networks Technology (June 14, 2007); Press Release, XO Communications Signs Multi-Million Dollar Deal with Hatteras Networks for Nationwide Mid-Band Ethernet Services Rollout (April 19, 2007); *see also* Letter from William H. Johnson, Verizon Assistant General Counsel to Marlene H. Dortch, FCC Secretary, at 3 (Oct. 9, 2007).

In refusing to continue saddling the ILECs with dominant-carrier regulation in addition to common-carrier regulation, the FCC also noted competitive carriers' growing ability to deploy their own facilities and thereby reduce their reliance on ILECs altogether. *See AT&T Order*, 22 F.C.C.R. at 18,724, ¶ 32; *Embarq/Frontier Order*, 22 F.C.C.R. at 19,496-97, ¶ 31. The FCC recognized the significant construction costs of replicating the ILECs' last-mile connections to individual businesses. But those costs, the FCC explained, nonetheless could be justified – and perhaps more importantly, were already being justified by several competitive providers – by the sizable revenues that could be obtained. *See AT&T Order*, 22 F.C.C.R. at 18,724, ¶ 32 (citing FCC findings, studies, and various competitive carriers' public statements regarding their self-deployments); *Embarq/Frontier Order*, 22 F.C.C.R. at 19,496-97, ¶ 31 (same). As intervenors noted, self-deployment is not simply a

theoretical possibility; it is occurring.  Perhaps an obvious point, but a decision that gives owners of telecommunications lines more control over access to those lines tends to increase the incentive for competitors to build competing lines.  The FCC is permitted under § 706 to take that action-forcing consideration into account when calibrating the appropriate degree of regulation on ILECs' special access lines.  The FCC thus reasonably considered both the existence and the desirability of self-deployment as factors that further supported eliminating dominant-carrier regulation on the ILECs.

Finally, in reaching its decision, the FCC emphasized that its ongoing Special Access Rulemaking proceeding will address, on an industry-wide basis, general concerns about discriminatory practices by ILECs with respect to their special access lines.  In that docket, the Commission is looking broadly and deeply at the market to make sure ILECs are not engaging in unjust and unreasonable practices.  It is true that the proceeding seems to be moving at a slow pace.  But even as we write, numerous interested parties are making their voices heard both to the FCC and in the broader public debate over this issue.  That is as it should be.  For present purposes, the relevant point is that the FCC's forbearance decision in this particular matter (or in the related Verizon and Qwest special access matters) is not chiseled in marble.  So Congress and the FCC will be able to reassess as they reasonably see fit based on changes in market conditions, technical capabilities, or policy approaches to regulation in this area.

Putting all of the pieces together, we find the FCC's approach in this case to be reasonable and reasonably explained.  In seeking to promote broadband competition and deployment, the Commission maintained common-carrier regulation on the ILECs' special access lines, including the

interconnection mandate and the requirement that prices be just, reasonable, and not unreasonably discriminatory. It made clear that the § 208 fast-track complaint process is open and available for prompt refereeing of disputes. It determined that competitive broadband service providers could use heavily regulated TDM-based services to compete. It recognized the fact and feasibility of competitive self-deployment of special access lines – a development that both helps justify and will be furthered by the FCC's decision. And finally, the FCC is continuing to study the overall market developments in special access on an industry-wide basis. Given all of that, we must defer to the Commission's judgment that dominant-carrier pricing regulation is unnecessary to ensure just, reasonable, and non-discriminatory rates and the protection of consumers, and that partial forbearance is consistent with the public interest.

III

We need only briefly address the separate arguments put forth by the New Jersey Division of Rate Counsel, or NJRC.

We agree with the FCC that the NJRC has not demonstrated its Article III standing to challenge the *AT&T Order*. The NJRC alleges injury to New Jersey customers, but AT&T and its affiliates do not provide service in New Jersey. For New Jersey ratepayers, there is no "injury in fact" to speak of, no "causal relationship between the injury and the [*AT&T Order*]," and no "likelihood that the injury will be redressed by a favorable decision." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996).

That said, the NJRC does have standing to challenge the *Embarq/Frontier Order*. But the NJRC's federalism and

separation of powers objections to the FCC's forbearance authority are not before the Court because they were not properly raised before the FCC. *See* Comments of the New Jersey Division of the Rate Counsel, No. 06-125 (Aug. 17, 2006) at 5-6. Under 47 U.S.C. § 405(a), the FCC's "opportunity to pass" on an issue is a "condition precedent to judicial review." Accordingly, § 405(a) bars the NJRC's constitutional claims against the *Embarq/Frontier Order*.

The NJRC's only properly raised claim against the *Embarq/Frontier Order*, therefore, is that the FCC failed to provide adequate notice-and-comment procedures under the Administrative Procedure Act. But the FCC *did* provide an opportunity for notice and comment. *See* Public Notice, 21 F.C.C.R. 8,022 (2006). We therefore reject the NJRC's argument.

\* \* \*

We deny the petitions for review.

*So ordered.*