

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-16-2007

# Time Warner v. FCC

Precedential or Non-Precedential: Precedential

Docket No. 05-4769

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Time Warner v. FCC" (2007). *2007 Decisions.* Paper 289.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/289

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>PRECEDENTIAL</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 05-4769, 05-5153, 06-1466, 06-1467
_____

TIME WARNER TELECOM, Inc.,

<u>Petitioner</u> in No. 05-4769,

v.

FEDERAL COMMUNICATIONS COMMISSION; and
UNITED STATES OF AMERICA,

<u>Respondents</u>.

_____

EARTHLINK INC.,

<u>Petitioner</u> in No. 05-5153,

v.

FEDERAL COMMUNICATIONS COMMISSION,

<u>Respondent</u>.

_____

COMPTEL,

<u>Petitioner</u> in No. 06-1466,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

MONTANA SKY NETWORKS INC,
d/b/a MONTANASKY.NET,

Intervenor.

_____

ACN COMMUNICATIONS SERVICES INC.;
BROADWING COMMUNICATIONS, LLC.; INTEGRA
TELECOM INC; MCLEODUSA TELECOMMUNICATIONS
SERVICES, INC.; MPOWER COMMUNICATIONS CORP.;
and PAC-WEST TELECOMM, INC.,

Petitioners in No. 06-1467,

v.

FEDERAL COMMUNICATIONS  COMMISSION; and
UNITED STATES  OF AMERICA

Respondents.

_____

On Petition for Review of a Final Order of the
Federal Communications Commission

_____

Argued March 16, 2007

Before: FUENTES, GREENBERG, and LOURIE,[*] Circuit
Judges.

(Filed: October 16, 2007)

_____

[*] Honorable Alan D. Lourie, United States Circuit Judge for
the Federal Circuit, sitting by designation.

David P. Murray **(Argued)**
Wilkie, Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006

      Counsel for Petitioner Time Warner Telecom Inc.

James M. Carr **(Argued)**
Federal Communications Commission
Office of General Counsel
445 12th Street, S.W.
Washington, DC 20554

      Counsel for Respondent Federal Communications
Commission

Nancy C. Garrison
Catherine G. O'Sullivan
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

      Counsel for Respondent United States of America

Michael K. Kellogg **(Argued)**
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, DC 20036

      Counsel for Intervenors BellSouth Corp. and AT&T Inc.

Robert B. McKenna
Qwest Services Corporation
1801 California Street
10th Floor
Denver, CO 80202

      Counsel for Intervenor Qwest Communications
International Inc.

Stephen J. Rosen
Levine, Blaszak, Block & Boothby LLP
2001 L Street, N.W., Suite 900
Washington, D.C. 20036

Counsel for Intervenor Ad Hoc Telecommunications
Users Committee

Andrew G. McBride
Wiley Rein LLP
1776 K Street, N.W.
Washington, DC 20006

Counsel for Intervenors the Verizon telephone companies

Mark J. O'Connor
Donna N. Lampert **(Argued)**
Lampert & O'Connor, P.C.
1775 K Street, N.W.
Suite 700
Washington, DC 20006

Counsel for Petitioner Earthlink Inc.

Harold Feld
Media Access Project
1625 K Street, N.W.
Suite 1118
Washington, DC 20006

Counsel for Intervenors National Alliance for Media Arts
and Culture; Office of Communication of the United Church of
Christ, Inc.; and Center for Digital Democracy

Marc J. Fink
John W. Butler **(Argued)**
Sher & Blackwell LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036

Counsel for Petitioner COMPTEL

Ivan C. Evilsizer
2301 Colonial Drive
Suite 2B
Helena, MT 59601

Counsel for Intervenor Montana Sky Networks Inc.

Joshua M. Bobeck
Bingham McCutchen LLP
3000 K Street, N.W.
Suite 300
Washington, DC 20007

Counsel for Petitioners ACN Communications Services
Inc.; Broadwing Communications; Integra Telecom Inc.;
McLeodUSA Telecommunications Services Inc.; Mpower
Communications Corp.; and Pac-West Telecomm. Inc.

————————

OPINION

————————

FUENTES, <u>Circuit Judge</u>.

The petition under review arises from an order of the Federal Communications Commission ("FCC"), which substantially limits federal regulation of high-speed Internet access service provided over traditional telephone lines (referred to as "wireline broadband Internet access service"). The dispute centers, in large part, on the FCC's decision to relieve telephone companies of decades-old regulations that required them to grant competing Internet service providers nondiscriminatory access to their wirelines in order to reach consumers. The FCC contends that these regulations "imposed significant costs" on telephone companies, "thereby impeding innovation and investment in new broadband technologies and services." (FCC Br. at 43.) Presumably, the FCC's order now allows telephone companies to

5

enter into individually negotiated arrangements with entities that seek access to their broadband wireline facilities.

Petitioners, who are independent Internet service providers, competing telecommunications service providers, cable modem providers, and various public interest organizations, argue that the FCC's order allows telephone companies to deny competitors access to their wirelines, thereby resulting in decreased competition and consumer choice in the market for broadband Internet service.[1] For the reasons stated below, we conclude that the FCC's order is based on a reasonable interpretation of the Communications Act of 1934, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151-614 (2006)), and a proper exercise of agency discretion. Accordingly, we will deny the petition for review.[2]

## I.  BACKGROUND

We discuss in some detail the complex technical and regulatory context for the FCC's order, which is set forth at Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, 20 F.C.C.R. 14853 (2005) ("Wireline Broadband Order").

### A.  Technical Background

Before the advent of broadband technology, consumers

---

[1] For example, Time Warner argues that "[a]bsent compulsory regulation to make their transmission lines available to competitive providers of Internet access, [the dominant telephone companies] will be free to target their investments in network upgrades to transmission inputs they make available only to their own retail broadband Internet access services." (Time Warner Br. at 7.)  "The resulting disparity in service between broadband Internet access service offered by" telephone companies and their competitors, will give telephone companies "the ability to raise prices unilaterally on their higher-quality services without fear of losing market share." (Time Warner Br. at 8.)

[2] We have jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1) to review the FCC's order.

accessed the Internet using "dial-up" connections provided over the interconnected system of telephone wires known as a local exchange.[3]  See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Svcs., 545 U.S. 967, 974 (2005) ("Brand X").  With a dial-up connection, consumers use computer modems to make calls which Internet service providers ("ISPs") link to the Internet by providing consumers with a physical connection and "the ability to translate raw Internet data into information they may both view on their personal computers and transmit to other computers connected to the Internet."  Id.  Dial-up connections, also referred to as "narrowband" connections, transmit data at relatively slow speeds.  Id. at 974-75.

---

[3] The Supreme Court has described the physical structure of a local exchange as

> a network connecting terminals like telephones, faxes, and modems to other terminals within a geographical area like a city. From terminal network interface devices, feeder wires, collectively called the "local loop," are run to local switches that aggregate traffic into common "trunks." The local loop was traditionally, and is still largely, made of copper wire, though fiber-optic cable is also used, albeit to a far lesser extent than in long-haul markets. Just as the loop runs from terminals to local switches, the trunks run from the local switches to centralized, or tandem, switches, originally worked by hand but now by computer, which operate much like railway switches, directing traffic into other trunks. A signal is sent toward its destination terminal on these common ways so far as necessary, then routed back down another hierarchy of switches to the intended telephone or other equipment.

Verizon Commc'ns v. FCC, 535 U.S. 467, 489-90 (2002) (footnotes omitted).  In the order on review, the FCC noted that wireline infrastructure is rapidly changing, but that "these developments [have] not fundamentally change[d] the capabilities of the wireline network."  Wireline Broadband Order, 20 F.C.C.R. at 14873 ¶ 34.

By contrast, "broadband" connections, which are increasingly replacing dial-up connections, are much faster and are principally provided by: (1) cable modem service and (2) Digital Subscriber Line (DSL) service. DSL service, the type of transmission at issue in the Wireline Broadband Order, involves the use of "[t]wo DSL modems [that] are attached to a telephone loop, one at the subscriber's premises and one at the telephone company's central office." WorldCom, Inc. v. FCC, 246 F.3d 690, 692 (D.C. Cir. 2001). If the line carries telephone service and high-speed data transmission, the telephone company—also known as the local exchange carrier ("LEC")—separates the streams and sends ordinary voice calls to the telephone network and data traffic to a "packet-switched data network" where it is routed to an ISP.[4] Id. LECs use their transmission facilities to provide consumers with Internet access service, in which case they are referred to as "facilities-based ISPs." See Brand X, 545 U.S. at 975; Wireline Broadband Order, 20 F.C.C.R. at 14858 ¶ 5. They also lease their wires on a wholesale basis to independent ISPs, referred to as "non-facilities-based ISPs," who use the wires to reach their customers. See Brand X, 545 U.S. at 975; Wireline Broadband Order, 20 F.C.C.R. at 14864-65 ¶ 16 n.43.

## B. Regulatory Framework

There are three key developments in the regulatory history of telecommunications and data processing services that are significant to this petition for review: (1) Congress's passage of the Communications Act in 1934; (2) the FCC's issuance of its Computer II ruling in 1980; and (3) the passage of the Telecommunications Act in 1996. We discuss each in turn.

### 1. The Common Carrier Doctrine

---

[4] The terms "telephone company," "local exchange carrier," "telephone common carrier" and "communications common carrier," and other combinations of these terms, are often used interchangeably in the relevant case law and FCC rulings. Each term has its own historical and regulatory context and, where possible, we use them with that in mind.

The regulatory issues raised in the Wireline Broadband Order trace back to the enactment of the Communications Act in 1934, which established the FCC's "broad authority to regulate interstate telephone communications." Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc., 127 S. Ct. 1513, 1516 (2007). Title II of the statute heavily regulated the activities of local telephone companies by imposing upon them certain "common carrier" obligations.[5] See id. at 1517. For example, Title II required telephone companies to charge consumers "just and reasonable" rates and to file and make publicly available their rate schedules (known as "tariffs"); authorized the FCC to set rates if the ones offered by a carrier were not just and reasonable; prohibited carriers from constructing new wirelines without first obtaining a certificate of public convenience and necessity from the FCC; and established liability for carriers that violated the statute.

---

[5] In incorporating common carrier requirements into Title II of the Communications Act, Congress adopted many of the rules set forth in the Interstate Commerce Act of 1887, 24 Stat. 379, which previously served as the statutory basis for federal regulation of the railroad and telephone industries. Global Crossing, 127 S. Ct. at 1517. The Court of Appeals for the D.C. Circuit has explained that the common carrier doctrine emerged out of common law rules which historically

> impose[d] a greater standard of care upon carriers who held themselves out as offering to serve the public in general. The rationale was that by holding themselves out to the public at large, otherwise private carriers took on a quasi-public character. This character, coupled with the lack of control exercised by shippers or travellers over the safety of their carriage, was seen to justify imposing upon the carrier the status of an insurer.

Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC, 525 F.2d 630, 640 (D.C. Cir. 1976). The D.C. Circuit further explained in a later related decision that the "sine qua non of common carrier status" is that the entity has taken on "a quasi public character, which arises out of the undertaking to carry for all people indifferently." Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC, 533 F.2d 601, 608 (D.C. Cir. 1976) (internal quotation marks omitted).

9

Communications Act, ch. 652, §§ 201-03, 205-06, 214, 48 Stat. 1068, 1070-71, 1072-73, 1075-76 (1934) (prior to 1996 amendments). These common carrier provisions remain essentially unchanged, see 47 U.S.C. §§ 201-03, 205-06, 214, although, as discussed below, Congress has since amended Title II to include additional common carrier obligations. See generally 47 U.S.C. §§ 201-276 (setting forth the Communications Act's Title II common carrier requirements).

### 2. The FCC's Computer Inquiry Proceedings

In 1966, the FCC initiated the Computer Inquiry proceedings to address the regulatory issues presented by the growing convergence of traditional telephone communications and data processing services. The FCC issued three important rulings in connection with the proceedings, known as "Computer I," "Computer II," and "Computer III."

In Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 28 F.C.C.2d 267, ¶ 2 (1971) ("Computer I"), the FCC addressed "the nature and extent of regulatory jurisdiction and control" which it would "exercise over the furnishing of data processing and communications services, or some combination thereof," by telephone and data processing companies. With respect to telephone companies subject to Title II common carrier requirements, the FCC was concerned that "without appropriate regulatory safeguards, the provision of data processing services by common carriers could adversely affect the statutory obligation of such carriers to provide adequate communications services under reasonable terms and conditions and impair effective competition in the sale of data processing services."[6] Id. ¶ 8.

---

[6] Specifically, the FCC identified the following issues:

(a) That the sale of data processing services by carriers should not adversely affect the provision of efficient and economic common carrier services;
(b) That the costs related to the furnishing of such data services should not be passed on, directly or indirectly, to the users of common carrier services;

10

To address the concern, the FCC, pursuant to its rulemaking authority, required "maximum separation of activities which are subject to regulation [*i.e.*, traditional telephone communications] from non-regulated activities involving data processing" to ensure "adequate and efficient communications services at reasonable and non-discriminatory rates and practices." Id. ¶ 10 (internal quotations marks omitted). Thus, telephone companies that provided consumers with data processing services were permitted to do so "only through affiliates utilizing separate books of account, separate officers, separate operating personnel and separate equipment and facilities devoted exclusively to the rendition of data processing services." Id. ¶ 12.

At the same time that it imposed these structural safeguards on telephone companies, the FCC determined that the Communications Act did not require it to exercise full regulatory authority over data processing services in general. See id. ¶¶ 4, 11, 30. As the FCC stated: "where message switching is offered as an integral part of and as an incidental feature of a package offering that is primarily data processing, there will be total regulatory forbearance with respect to the entire service whether offered by a common carrier or non-common carrier." Id. ¶ 31.

In Amendment of Section 64.702 of the Commission's Rules and Regulations, 77 F.C.C.2d 384, ¶ 2 (1980) ("Computer II"), issued nine years after its Computer I ruling, the FCC addressed technological developments that had further blurred the boundary between traditional telecommunications and data processing services. The FCC adopted a regulatory framework that distinguished between the offering of "basic transmission service" and "enhanced service"—subjecting only the former to mandatory

---

(c) That revenues derived from common carrier services should not be used to subsidize any data processing services; and
(d) That the furnishing of such data processing services by carriers should not inhibit free and fair competition between communication common carriers and data processing companies . . . .

Id. ¶ 9.

11

Title II regulation. Id. ¶¶ 5, 7. The FCC defined "basic service" as "limited to the common carrier offering of transmission capacity for the movement of information." Id. ¶¶ 5, 93. "In offering this capacity, a communications path is provided for the analog or digital transmission of voice, data, video, etc. information," and "the carrier's basic transmission network is not used as an information storage system." Id. ¶¶ 93, 95. In other words, "a carrier essentially offers a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." Id. ¶ 96.

In contrast, the FCC defined "enhanced service" as "any offering over the telecommunications network which is more than basic transmission service." Id. ¶ 97. The FCC elaborated:

> In an enhanced service . . . computer processing applications are used to act on the content, code, protocol, and other aspects of the subscriber's information . . . additional, different, or restructured information may be provided the subscriber through various processing applications performed on the transmitted information, or other actions can be taken by either the vendor or the subscriber based on the content of the information transmitted through editing, formating [sic], etc. Moreover, in an enhanced service the content of the information need not be changed and may simply involve subscriber interaction with stored information.

Id. (footnote omitted).

In addition to distinguishing between basic transmission services (subject to Title II) and enhanced services (not subject to Title II), the FCC eliminated the maximum separation regime with respect to all telephone common carriers except those under the control of AT&T and GTE, the two dominant carriers that the FCC determined had sufficient market power to engage in anticompetitive activity on a national scale. See id. ¶ 228. Thus, telephone companies were no longer required to use separate affiliates to provide enhanced services to consumers. However, the FCC, pursuant to its ancillary jurisdiction under Title I of the

12

Communications Act, 47 U.S.C. §§ 151-61, required those carriers engaged in the provision of enhanced services to grant competing providers access to their wirelines on a nondiscriminatory basis pursuant to tariffs governed by Title II. Id. ¶ 132. The FCC explained the Computer II nondiscriminatory access requirements as follows:

> Because enhanced services are dependent on the common carrier offering of basic services, a basic service is the building block upon which enhanced services are offered. Thus those carriers that own common carrier transmission facilities and provide enhanced services, but are not subject to the separate subsidiary requirement, must acquire transmission capacity pursuant to the same prices, terms, and conditions reflected in their tariffs when their own facilities are utilized. Other offerors of enhanced services would likewise be able to use such a carrier's facilities under the same terms and conditions.

Id. ¶ 231. These nondiscriminatory access rules are at the center of this petition for review.

Finally, six years later, in Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry); and Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations, 104 F.C.C.2d 958 (1986) ("Computer III"), the FCC replaced the maximum separation regime applied to the dominant telephone companies with a system of nonstructural safeguards.

### 3. Telecommunications Act of 1996

Congress substantially amended the Communications Act of 1934 when it passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.). As one commentator has explained, "the principal goal in the 1996 Act was to open the local telephone market to effective competition." James B. Speta, Handicapping the Race for the Last Mile? A Critique of Open Access Rules for

Broadband Platforms, 17 Yale J. on Reg. 39, 63 (2000). Thus, Title II was expanded to include additional requirements intended to break up the dominance of a small number of LECs over the telecommunications market. Id.

As amended, Title II imposes on LECs the duty not to prohibit or unreasonably restrict resale of their services; to provide number portability so that consumers can switch LECs but still retain their phone numbers; to accord dialing parity so that a LEC customer can reach a customer of another LEC by dialing no more digits than necessary; to permit competing LECs access to their rights of way; and to establish reciprocal compensation with other LECs for the transport and termination of all calls. See id. at 64 (citing 47 U.S.C. §§ 251(b)(1)-(5)).

In addition, Title II imposes on "incumbent local exchange carriers" ("ILECs"), defined as any LEC that existed as of the date the Telecommunications Act was passed, the obligation to permit nondiscriminatory interconnection with another carrier's facilities at any feasible point in the ILEC's network; provide any other carrier unbundled access to certain elements of the ILEC's network at cost-based rates; establish wholesale rates for the resale of any telecommunications service provided by the ILEC; provide the FCC with notice of any changes to the ILEC's network; and permit the collocation of other telecommunications carriers' equipment on the ILEC's premises.[7] See id. at 65 (citing 47 U.S.C. §§ 251(c)(2)-

---

[7] The Supreme Court has explained that, "[i]t is easy to see why [an ILEC] would have an almost insurmountable competitive advantage . . . in routing calls within the exchange." Verizon, 535 U.S. at 490. Specifically, "[a] newcomer could not compete with the incumbent carrier to provide local service without coming close to replicating the incumbent's entire existing network, the most costly and difficult part of which would be laying down the 'last mile' of feeder wire, the local loop, to the thousands (or millions) of terminal points in individual houses and businesses." Id. In addition, "[t]he incumbent company could also control its local loop plant so as to connect only with terminals it manufactured or selected, and could place conditions or fees (called 'access charges') on long-distance carriers seeking to connect with its network." Id. at 490-91. Thus, "[i]n an unregulated world, another

14

(6)).

Crucial to this petition for review, the Telecommunications Act also introduced two new important regulatory classifications that parallel the basic and enhanced services distinction established in Computer II: "telecommunications service" and "information service." 47 U.S.C. § 153(20) & (46). Only telecommunications service is subject to mandatory regulation under Title II.

## C.  Regulatory Treatment of Broadband Internet Access Service

### 1.  Cable Modem Broadband Internet Access Service

The FCC first applied the Communications Act's new regulatory classifications to broadband Internet access service in its ruling in Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, 17 F.C.C.R. 4798 (2002) ("Cable Modem Declaratory Ruling"). In the ruling, the FCC concluded that broadband Internet access service provided by cable companies is an "information service," which does not include a separate "telecommunications service" subject to mandatory Title II common carrier regulation. Id. at 4802 ¶ 7. In addition, the FCC declined to apply the Computer II nondiscriminatory access requirements to cable modem broadband operators despite the fact that, at the time, telephone companies engaged in the provision of enhanced services were required to provide non-facilities-based ISPs nondiscriminatory access to their transmission facilities. Id. at 4825 ¶ 43. The Supreme Court upheld the Cable Modem Declaratory Ruling in Brand X, 545 U.S. at 1002, noting that it "appears to be a first-step in an effort to reshape the way the Commission regulates information-service providers."

### 2.  Procedural Background to the Wireline Broadband Order

In February 2002, shortly before it released the Cable Modem Declaratory Ruling, the FCC issued a notice of proposed

telecommunications carrier would be forced to comply with these conditions, or it could never reach the customers of a local exchange." Id. at 491.

rulemaking, setting forth and requesting public comment on a number of tentative conclusions concerning the regulatory treatment of wireline broadband Internet access service. Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, 17 F.C.C.R. 3019 (2002) ("Wireline Broadband NPRM"). In response, the FCC received numerous comments from a wide range of interested parties.

On September 23, 2005, three months after the Supreme Court's Brand X decision, the FCC released the order on review, which substantially limited federal regulation of wireline broadband Internet access service through two principal rulings. First, the FCC ruled that wireline broadband Internet access service, like cable modem service, is an information service that does not include a separate "telecommunications service" subject to mandatory common carrier regulation under Title II of the Communications Act, regardless of whether such service is provided by LECs or non-facilities-based ISPs. Wireline Broadband Order, 20 F.C.C.R. at 14862-66 ¶¶ 12-17. Second, the FCC eliminated the Computer II requirements on grounds that market conditions no longer justify requiring LECs to grant independent ISPs nondiscriminatory access to their wireline transmission facilities. See, e.g., id. at 14879-87 ¶¶ 47-64. These consolidated petitions for review followed.

Petitioners, who are independent ISPs, competing telecommunications service providers, cable modem providers, and various public interest organizations, challenge the FCC's statutory classification and Computer II rulings.[8] We address both in turn.

_____

[8] Separate briefs have been filed with the Court by the following petitioners: (1) Time Warner Telecom, Inc., which provides broadband cable modem Internet access service ("Time Warner"); (2) Earthlink, Inc., a non-facilities-based ISP ("Earthlink"); (3) COMPTEL, a trade association that represents telecommunications carriers and independent ISPs ("COMPTEL"); and (4) a group of non-facilities-based telecommunications and Internet access services providers referred to collectively as "ACN." Intervening in support of petitioners are the National Alliance for Media Arts and Culture; the Office of Communication of the United Church of Christ, Inc.; the Center for Digital

16

## II.  STANDARD OF REVIEW

Our review is governed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), and § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006).  <u>See</u> <u>Brand X</u>, 545 U.S. at 974.  <u>Chevron</u> requires a federal court to defer to an agency's reasonable interpretation of any ambiguities in a statute which it administers.  <u>Id.</u> at 980.  Section 706 of the APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

## III.  STATUTORY CLASSIFICATION

In the <u>Wireline Broadband Order</u>, the FCC rejected the proposition that wireline broadband Internet access service "includes *both* an information service *and* a telecommunications service."  <u>Wireline Broadband Order</u>, 20 F.C.C.R. at 14862 ¶ 12 n.31.  Rather, it found that wireline broadband Internet access service is a functionally integrated "information service."  <u>Id.</u>  We conclude that this statutory classification is based on a reasonable interpretation of the Communications Act.

The classification of a particular service as a "telecommunication service" or an "information service" under the Communications Act turns on the following definitions in the statute:

> The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's own choosing, without change in the form or content of the information as sent and received.

---

Democracy; and Montana Sky Networks, Inc.  In addition, AT&T Inc.; BellSouth Corp.; Qwest Communications International Inc.; and the Verizon telephone companies (collectively "AT&T") have intervened and filed a separate brief in support of the FCC.

17

47 U.S.C. § 153(43).

> The term "telecommunications service" means the *offering* of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

47 U.S.C. § 153(46) (emphasis added).

> The term "information service" means the *offering* of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . . . .

47 U.S.C. § 153(20) (emphasis added).

In Brand X, the Supreme Court, applying Chevron's familiar two-step analysis, concluded that the term "telecommunications service" is ambiguous as applied to cable modem Internet access service "[b]ecause the term 'offer' can sometimes refer to a single, finished product and sometimes to the individual components in a package being offered."[9] 545 U.S. at 991-92 (internal quotation marks and citations omitted). The Court

---

[9] Under Chevron, "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." 467 U.S. at 842. First, the court asks "whether Congress has directly spoken to the precise question at issue." Id. If Congress's intent is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue" presented, the court must ask whether the agency's interpretation "is based on a permissible construction of the statute." Id. at 843. The Court explained in Brand X, "if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." 545 U.S. at 980.

elaborated:

> Cable companies in the broadband Internet service business "offe[r]" consumers an information service in the form of Internet access and they do so "via telecommunications," § 153(20), but it does not inexorably follow as a matter of ordinary language that they also "offer[r]" consumers the high-speed data transmission (telecommunications) that is an input used to provide this service, § 153(46).

Id. at 989 (alterations in original). The Court illustrated its conclusion using the following analogy:

> One might well say that a car dealership "offers" cars, but does not "offer" the integrated major inputs that make purchasing the car valuable, such as the engine or the chassis. It would, in fact, be odd to describe a car dealership as "offering" consumers the car's components in addition to the car itself. Even if it is linguistically permissible to say that the car dealership "offers" engines when it offers cars, that shows, at most, that the term "offer," when applied to a commercial transaction, is ambiguous about whether it describes only the offered finished product, or the product's discrete components as well. It does not show that no other usage is permitted.

Id. at 990.[10] Given this ambiguity in the statute, the Court

---

[10] In Part I of his dissent, Justice Scalia (joined by Justices Souter and Ginsburg) strongly disagreed with the majority, stating that cable modem providers necessarily "offer" consumers a separate "telecommunications service" when they provide them with Internet access service. Justice Scalia provided a competing analogy:

> If, for example, I call up a pizzeria and ask whether they offer delivery, both common sense and common "usage" would prevent them from answering: "No,

19

considered whether the FCC's conclusion that cable modem providers do not "offer" consumers a separate "telecommunications service" was based on a permissible construction of the Communications Act under <u>Chevron</u>.

In its ruling, the FCC "conceded that, like all information-service providers, cable companies use 'telecommunications' to provide consumers with Internet service." <u>Id.</u> at 988. That is, "cable companies provide such service via the high-speed wire that transmits signals to and from an end user's computer." <u>Id.</u> But whether that service also includes a telecommunications "offering," in the FCC's view, "'turn[ed] on the nature of the functions the *end user* is offered.'" <u>Id.</u> (quoting <u>Cable Modem Declaratory Ruling</u>, 17 F.C.C.R. at 4822 ¶ 38). In the FCC's judgment, end users do not perceive the service they receive as consisting of both a data processing component and a transmission component.

The Supreme Court explained the FCC's conclusion

> we do not offer delivery—but if you order a pizza from us we'll bake it for you and then bring it to your house. The logical response to this would be something on the order of, "so you *do* offer delivery." But, our pizza-man may continue to deny the obvious and explain, paraphrasing the FCC and the Court: "No, even though we bring the pizza to your house, we are not actually 'offering' you delivery, because the delivery that we provide to our end users is 'part and parcel of' our pizzeria-pizza-at-home service and is 'integral to its other capabilities.'" Any reasonable customer would conclude at that point that his interlocutor was either crazy or following some too-clever-by-half legal advice.

<u>Id.</u> at 1007 (Scalia, J., dissenting) (citations and footnotes omitted). In the majority's view, the dissent's argument "only underscores that the term 'offer' is ambiguous in the way that we have described . . . leav[ing] federal telecommunications policy in this technical and complex area to be set by the Commission, not by warring analogies." <u>Id.</u> at 991-92.

concerning end user perception:

> Seen from the consumer's point of view, the Commission concluded, cable modem service is not a telecommunications offering because the consumer uses the high-speed wire always in connection with the information-processing capabilities provided by Internet access, and because the transmission is a necessary component of Internet access: "As provided to the end user the telecommunications is part and parcel of cable modem service and is integral to its other capabilities."

Id. (quoting Cable Modem Declaratory Ruling, 17 F.C.C.R. at 4823 ¶ 39). "The wire is used, in other words, to access the World Wide Web, newsgroups, and so forth, rather than 'transparently' to transmit and receive ordinary-language messages without computer processing or storage of the message." Id. Because of the "integrated" nature of the offering, the FCC determined, "cable modem service is not a 'stand-alone,' transparent offering of telecommunications." Id. (quoting Cable Modem Declaratory Ruling, 17 F.C.C.R. at 4823-25 ¶¶ 41-43).

The Supreme Court concluded that the FCC's determination was reasonable, given "[t]hat [the] question turns not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided, questions Chevron leaves to the Commission to resolve in the first instance." Id. at 991. Moreover, the Court observed, the FCC's emphasis on how end users perceive the nature of the service being offered was consistent with Computer II, which defined "basic" and "enhanced" services "functionally, based on how the consumer interacts with the provided information." Id. at 992-93.

Applying the same analytical approach used in the Cable Modem Declaratory Ruling, the FCC, in this proceeding, concluded that "wireline broadband Internet access service provided over a provider's own facilities is appropriately classified as an information service because its providers offer a single, integrated service (*i.e.*, Internet access) to end users." Wireline Broadband Order, 20 F.C.C.R. at 14863 ¶ 14. The parties agree

21

that Internet service is an information service not subject to Title II regulation.  (See COMPTEL Br. at 6; AT&T Br. at 6.) Petitioners contend, however, that the FCC erroneously concluded that the wireline transmission component used to provide broadband Internet access is not a "telecommunication service" offering subject to mandatory Title II regulation.

Petitioners advance three principal arguments which we address in turn: that the FCC's statutory classification of wireline broadband Internet access service (1) is not supported by record evidence; (2) is contrary to the FCC's past rulings; and (3) is inconsistent with the FCC's classification of wireline broadband service under the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. §§ 1001-02.

## A.  Record Evidence

In the Wireline Broadband Order, the FCC determined that "like cable modem service (which is usually provided over the provider's own facilities), wireline broadband Internet access service combines computer processing, information provision, and data transport, enabling end users to run a variety of applications (*e.g.*, e-mail, web pages, and newsgroups)."  20 F.C.C.R. at 14863 ¶ 14.  Given the similarity between how end users perceive the finished product (Internet access), whether provided by wireline or cable modem providers, the FCC concluded that its decision to classify wireline broadband Internet access service as an information service logically flowed from the Supreme Court's Brand X decision.  See, e.g., id. at 14864 ¶ 15.  In our view, the record adequately supports the FCC's conclusion that from the perspective of the end-user, wireline broadband service and cable modem service are functionally similar and, therefore, that they should be subject to the same regulatory classification under the Communications Act.

For example, public comments submitted in response to the Wireline Broadband NPRM state that:

> [Cable modem, DSL, fixed wireless, and satellite service are] functionally similar.  Each is used primarily for Internet access; each can be used with

an ordinary personal computer, with a modest hardware addition; each provides an always-on connection, at comparable speeds; and unlike traditional dial-up connections, each enables consumers to use their ordinary telephone line for voice or fax while simultaneously accessing the Internet.

(J.A. at 2102) (Comments of Verizon, May 3, 2003) (footnotes omitted).

[P]roviders of [cable modem, DSL, fixed wireless, and satellite service] view them as substitutes. For example, cable operators have stated that they view DSL as their main competitor, whereas DSL providers have said the same thing about cable modem providers.

(J.A. at 2103) (Comments of Verizon, May 3, 2003) (footnotes omitted).

DSL & Cable Modem Access are Analogous
• <u>Functions</u> for data access provided to the end user are the same.
• Service set up <u>processes</u> are functionally identical . . .
• All data is <u>packetized</u>.
• IP Addresses are assigned to the Premises in the <u>same manner</u>.
• Data set-up uses similar <u>protocol</u> to connect to the Internet . . .
• The end user's computer can be used <u>interchangeably</u>. This means if the same ISP is connected to both the DSL and the Cable network, the user can plug their PC into either the DSL Modem or the Cable Modem and access their account.

(J.A. at 2789) (Ex Parte Letter from Qwest to FCC with Attached Presentation, April 28, 2003).

> [C]onsumers view [cable modem, DSL, fixed wireless, and satellite service] as interchangeable. As one analyst has explained, "most customers don't care about technologies," but are "platform agnostic," and simply want an experience that is better than narrowband dial-up. One poll found "little difference between perceptions among those planning to get either DSL or cable modem services."

(J.A. at 2103) (Comments of Verizon, May 3, 2003) (footnotes omitted).

Petitioners attempt to distinguish wireline broadband service from cable modem service on grounds that LECs offer their wireline transmission component on a "stand-alone" basis to other ISPs. That is, LECs lease their transmission facilities to independent ISPs who themselves provide consumers with Internet access service. Therefore, petitioners reason, LECs plainly "offer" a separate telecommunications service. We are not persuaded that this is a basis for distinguishing wireline broadband service from cable modem service.

The fact that LECs have provided independent ISPs with stand-alone transmission capabilities is, as the FCC points out, a function of the very regulatory requirements that the FCC's order seeks to eliminate—that is, wireline providers have been (until the release of the Wireline Broadband Order) the only broadband provider required by Computer II to offer their transmission component on a stand-alone basis. Wireline Broadband Order, 20 F.C.C.R. at 14886 ¶ 63. Indeed, record evidence considered in the Cable Modem Declaratory Ruling showed that cable modem providers not only have the capability to offer their transmission facilities on a stand-alone basis, but, in fact, have entered into agreements with independent ISPs to do so. Cable Modem Declaratory Ruling, 17 F.C.C.R. at 4828-31 ¶¶ 52-54. This fact did not prevent the Supreme Court from upholding the FCC's determination that cable modem service is a fully integrated information service. We see no reason why we should reach a contrary decision here.

## B. Past Agency Decisions

We are likewise unpersuaded by petitioners' argument that the FCC's statutory classification ruling is improper because it conflicts with past agency decisions. In particular, COMPTEL focuses on the Advanced Services Order, 13 F.C.C.R. 24012 ¶ 36 (1998), in which the FCC concluded that it would treat broadband Internet access service as consisting of both an information service and a telecommunications service.

The FCC candidly admitted in the Wireline Broadband Order that past agency statements concerning the regulatory treatment of wireline broadband Internet access service had not been "entirely consistent," but nevertheless found that there was ample basis in its prior rulings to support its classification of wireline broadband Internet access service as a functionally integrated information service. 20 F.C.C.R. at 14862 ¶12 n.32. For example, the FCC relied on its Report to Congress in Federal-State Joint Board on Universal Service, 13 F.C.C.R. 11501, 11519 ¶ 36 (1998) ("Universal Service Report"), in which it concluded that "the categories of 'information service' and 'telecommunications service' are mutually exclusive." See Wireline Broadband Order, 20 F.C.C.R. at 14862 ¶ 12 n.32. The FCC relied on the Universal Service Report "heavily" in the Cable Modem Declaratory Ruling, and the Supreme Court in Brand X clearly found this sufficient. See Brand X, 545 U.S. at 978.

In addition, to the extent that the FCC's current classification of wireline broadband Internet access service conflicts with past agency rulings, Brand X makes clear that an "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis." Id. at 981 (internal quotation marks omitted). As the Supreme Court stated, "[t]hat is no doubt why in Chevron itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy." Id. at 981-82. Accordingly, we do not agree that past conflicting FCC rulings render its statutory classification in this order arbitrary and capricious.

## C. Classification of Broadband Service under CALEA

Petitioners next argue that the FCC's classification of wireline broadband Internet access service as a fully integrated information service under the Communications Act is rendered arbitrary and capricious by the Commission's conflicting interpretation in its CALEA proceeding. We agree with the FCC that this argument is a "red herring." (See FCC Br. at 35.)

Congress enacted CALEA in 1994 to require telecommunications carriers to ensure that their networks are technologically capable of being accessed by law enforcement officials. See Am. Council on Educ. v. FCC, 451 F.3d 226, 228 (D.C. Cir. 2006). CALEA's substantive provisions apply to "telecommunications carriers," but not "information service" providers. See id. at 229. In Communications Assistance for Law Enforcement and Broadband Access and Services, 20 F.C.C.R. 14989, 14998-99 ¶ 18 (2005) ("CALEA Order"), released the same day as the Wireline Broadband Order, the FCC concluded that CALEA creates three categories of communications services: "pure telecommunications service," "pure information service," and "hybrid telecommunications-information service." It then determined that broadband services are hybrid telecommunications-information services subject to the statute. See id.

COMPTEL argues that the FCC's classification of wireline broadband service in the Wireline Broadband Order and the CALEA Order "cannot be squared with one another." (COMPTEL Br. at 36.) We agree with the D.C. Circuit, however, that the FCC has the discretion to interpret the two statutes differently. See Am. Council on Educ., 451 F.3d at 232-33. Specifically, CALEA (1) has a wholly distinct legislative history and Congressional purpose; (2) uses a different term (*i.e.*, "telecommunications *carrier*" not "telecommunications *service*") to establish the scope of the FCC's jurisdiction under the statute; and (3) has a different statutory structure which indicates that Congress did not intend that the terms "telecommunications carrier" and "information service" be mutually exclusive for purposes of identifying the entities that are subject to the statute's provisions. Id. at 231-35. Accordingly, we reject COMPTEL's argument that the FCC's CALEA Order renders its classification

26

of wireline broadband Internet access service under the Communications Act arbitrary and capricious.

In sum, petitioners do not provide us with a basis for vacating the FCC's ruling that wireline broadband Internet access service should not be subject to mandatory common carrier regulation under Title II of the Communications Act.

## IV.  NONDISCRIMINATORY ACCESS UNDER COMPUTER II

As discussed, in Computer II, the FCC, pursuant to its Title I ancillary jurisdiction, required all LECs to provide competing enhanced service providers nondiscriminatory access to the basic transmission component underlying their enhanced services.  See Wireline Broadband Order, 20 F.C.C.R. at 14868 ¶ 24.  Petitioners argue that the FCC's decision to eliminate the Computer II requirements was arbitrary and capricious because the FCC: (1) failed to engage in a proper market analysis and (2) failed to properly apply the common carrier test set forth in National Association of Regulatory Utility Commissioners v. FCC, 525 F.2d 630, 640 (D.C. Cir. 1976) ("NARUC I").  In addition, petitioners assert that the FCC decision to relieve LECs of their Computer II obligations violates the discontinuance requirements set forth in § 214 of the Communications Act, as well as the Due Process Clause of the Constitution.

### A.  Market Analysis

Petitioners argue that the FCC's blanket deregulation of wireline broadband Internet access service violates the agency's "well-established regulatory policy for assessing ILEC market power," which "differentiates between services demanded by distinct customer classes." (Time Warner Br. at 29.)  Specifically, petitioners contend, before eliminating the Computer II requirements, the FCC was required to consider ILECs' dominance of the business market and certain geographic markets.[11]

---

[11] The residential and business markets are also referred to as the "mass market" and the "enterprise market," respectively.

Accordingly, petitioners request that the Court remand this case to the FCC for a full market analysis. We do not agree that remand is necessary.

To the extent that the FCC's decision not to conduct a traditional market analysis constitutes a departure from past agency practice, it is well-settled that "an agency may change its course so long as it can justify its change with a 'reasoned analysis.'" Horn v. Thoratec Corp., 376 F.3d 163, 179 (3d Cir. 2004) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983)). Here, the FCC argues that it "fully justified its decision to refrain from standard market dominance analysis in order to avoid making highly dubious and 'premature' conclusions about a nascent and dynamic market that is 'rapidly changing.'" (FCC Br. at 54) (citing Wireline Broadband Order, 20 F.C.C.R. at 14898 ¶ 84).

For example, the FCC explained in its order that only 20% of consumers with access to advanced telecommunications capability subscribe to services providing such capability; approximately 50% of U.S. households subscribe to either broadband or narrowband Internet access service; and alternative broadband platforms are developing and emerging (*i.e.*, satellite, wireless, and powerline) in both the residential and business markets. Wireline Broadband Order, 20 F.C.C.R. at 14880-83 ¶¶ 50-51. By comparison, the market for telephone services—the context in which traditional market analysis has been applied—has had a market penetration rate of roughly 90% for more than twenty years. Id. at 14883-84 ¶ 55. Thus, in the FCC's view, "snapshot data" of the broadband service market "may quickly and predictably be rendered obsolete as the market continues to

_____

Time Warner does not dispute that cable modem broadband providers (like itself) are the clear market leader in the provision of broadband service to residential customers. It argues, however, that ILECs "remain the sole source of connectivity at roughly 98% of all business premises nationwide." (Time Warner Br. at 42; see also Earthlink Br. at 41.) ACN advances a similar argument with respect to the purported "monopoly" of ILECs in certain rural markets. (ACN Br. at 21.)

28

evolve." <u>Id.</u> at 14881 ¶ 50.

Instead, the FCC considered how the market for broadband services is likely to develop. For example, the FCC predicted based on record evidence that the market penetration of cable modem and wireline broadband service will grow dramatically in the future and that the two services will compete head-to-head; both services will continue to invest in and expand the reach of their services; emerging broadband platforms will exert competitive pressure and gain market share; and demand among consumers for broadband services will only increase. <u>See</u> <u>id.</u> at 14884-85 ¶¶ 56-61. We agree with the FCC that these reasons justified its decision to refrain from a traditional market analysis and to rely instead on larger trends and predictions concerning the future of the broadband services market. <u>See</u> <u>WorldCom, Inc. v. FCC</u>, 238 F.3d 449, 459 (D.C. Cir. 2001) (stating that the FCC is not required to "be confident to a metaphysical certainty of its predictions about the future of competition in a given market before it may modify its regulatory scheme.").

Indeed, as the FCC points out, its predictive judgments about matters within its expertise are entitled to substantial deference. <u>See</u> <u>FCC v. WNCN Listeners Guild</u>, 450 U.S. 582, 594-95 (1981). Moreover, we find significant that the FCC's market analysis in this proceeding is consistent with the approach taken in the <u>Cable Modem Declaratory Ruling</u>, in which the agency made no express findings that cable modem service providers are non-dominant. <u>See</u> <u>Brand X</u>, 545 U.S. at 1001 (noting that the FCC's conclusions concerning general "market conditions" and "substitute forms of Internet transmission" justified its regulatory treatment of cable modem service). In sum, despite petitioners' extensive discussion of conditions in specific customer and geographic markets, we conclude that the FCC's broad market analysis in this proceeding was both reasonable and consistent with the approach upheld by the Supreme Court in <u>Brand X</u>.

## B. The <u>NARUC I</u> Common Carrier Test

Petitioners argue that having eliminated the <u>Computer II</u> nondiscriminatory access requirements, the FCC was required to determine whether wireline broadband transmission facilities

should nevertheless be regulated on a common carriage basis under the test set forth in the D.C. Circuit's decision in NARUC I. Under this test, "a carrier has to be regulated as a common carrier if it will make capacity available to the public indifferently or if the public interest requires common carrier operation of the proposed facility." See Virgin Islands Tel. Corp. v. FCC, 198 F.3d 921, 924 (D.C. Cir. 1999) ("Vitelco") (internal quotation marks omitted). We disagree with petitioners that the FCC failed to properly consider the public interest prong of the NARUC I test.

It is well-settled that "the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference" because "the weighing of policies under the public interest standard is a task that Congress has delegated to the Commission." WNCN Listeners Guild, 450 U.S. at 596 (internal quotation marks omitted). Here, in addition to considering the market conditions discussed above, the FCC explained at length its judgment that continued regulation of wireline broadband providers under Computer II would harm consumers by "imped[ing] the development and deployment of innovative wireline broadband Internet access technologies and services." Wireline Broadband Order, 20 F.C.C.R. at 14887-88 ¶ 65.

For example, the FCC credited evidence that showed that wireline broadband providers are unable or unwilling to integrate more efficient equipment into their wireline networks because of the costs of complying with the Computer II requirements. See id. at 14887-88 ¶ 65-66. Likewise, the FCC noted that "[s]everal parties argue that the Computer Inquiry requirements prevent them from altering business priorities in response to changing market demands." Id. at 14890-91 ¶ 71. Accordingly, the FCC determined that eliminating the Computer II rules "will make it more likely that wireline operators will take more risks in investing in and deploying new technologies than they [were] willing and able to take under the [Computer Inquiry] regime." Id. at 14891-92 ¶ 72.

With respect to whether independent ISPs would continue to have reasonable access to ILECs' transmission facilities in the absence of regulatory compulsion, the FCC explained that the record showed that wireline broadband Internet access service

30

providers have business incentives to make their facilities available to competing ISPs on a commercially reasonable basis. Id. at 14892-94 ¶¶ 74-75. In particular, the FCC noted that ILECs have "an economic incentive to spread the costs of [their] network[s] over as much traffic and as many customers as possible regardless of whether such customers are wholesale or retail."[12] Id. at 14893 ¶ 74. In this regard, the FCC implicitly rejected the argument asserted by Time Warner in its brief, that as a result of the elimination of the Computer II requirements, "ILECs will now be free to upgrade the transmission inputs they use for their own retail broadband Internet access services, while restricting their competitors' access to the increasingly outmoded transmission services that remain subject to Title II regulation." (Time Warner Br. at 34.)[13]

---

[12] At the same time, the FCC noted that it disagreed "with commentors that equate the ability of *ISPs* to obtain wireline transmission services on a Title II basis with the ability of *consumers* to obtain facilities-based competitive broadband Internet access services." Id. at 14885-86 ¶ 62. In other words:

> A regulatory regime that promotes a competitive broadband Internet access services market where consumers have the choice of multiple providers is not necessarily the same as a regulatory regime that mandates that one particular type of broadband Internet access service transmission technology, and one alone, is available, on a nondiscriminatory basis, to any entity that desires to become an ISP.

Id.

[13] We are also unpersuaded by Earthlink's argument that the FCC could not relieve ILECs of the Computer II requirements unless it conducted a statutory forbearance analysis under § 10 of the Communications Act, 47 U.S.C. § 160. As previously discussed, the FCC established the Computer II regulations pursuant to its ancillary jurisdiction under Title I, and not because it determined that facilities-based wireline broadband Internet access service providers were subject to mandatory Title II common carrier regulation. Therefore, in eliminating the Computer II rules, the FCC was not forbearing from any statutory

31

## C. Section 214 of the Communications Act and the Due Process Clause

Finally, we reject petitioners' argument that the Wireline Broadband Order violates § 214 of the Communications Act and the Due Process Clause of the Constitution by granting ILECs a "blanket certification to discontinue providing existing customers [with] common carrier broadband Internet access transmission services." Wireline Broadband Order, 20 F.C.C.R. at 14908 ¶ 101.

Under § 214 of the Communications Act, before a common carrier may discontinue service, it must first obtain from the FCC a "certificate that neither the present nor future public convenience and necessity will be adversely affected thereby." 47 U.S.C. § 214(a). As discussed, the FCC fully considered the public interest before eliminating the Computer II rules, and petitioners point to no authority that prevents the FCC from granting a blanket certification. See Lincoln Telephone & Telegraph Co. v. FCC, 659 F.2d 1092, 1101 (D.C. Cir. 1981) (noting that "[s]ection 214(a) does not specify any particular procedure for making public interest determinations").

Moreover, we note that the order imposed a one-year transition period, requiring "facilities-based wireline transmission providers [to] continue to honor existing transmission arrangements with their current ISP or other customers," in order to "allow ISPs to continue operating under their current arrangements while they negotiate non-common carrier agreements." Wireline Broadband Order, 20 F.C.C.R. at 14905, 14906 ¶¶ 98, 99. The order further required LECs to provide both the customer and the FCC with advance notice of any discontinuance of service, with the FCC reserving the right to take any action that would be appropriate "to

requirement and § 10 does not come into play here. See, e.g., United States Telecom Ass'n v. FCC, 359 F.3d 554, 561, 579 (D.C. Cir. 2004) (concluding that § 10 forbearance analysis did not apply to FCC's discretionary decision not to require an ILEC to unbundle network elements under § 251 of the Communications Act).

protect the public interest." Wireline Broadband Order, 20 F.C.C.R. at 14908 ¶ 101. We fail to see how this aspect of the FCC's order deprives petitioners of notice or the opportunity to be heard, whether in violation of § 214 of the Communications Act or the Due Process Clause of the Constitution.[14]

## V. CONCLUSION

For the reasons stated, we conclude that the Wireline Broadband Order was based on a permissible interpretation of the Communications Act and a proper exercise of agency discretion. Accordingly, we will deny the petition for review.

_____

---

[14] Indeed, section 214 only requires the FCC to provide the Secretary of Defense, the Secretary of State, and the State Governor notice and an opportunity to be heard in the event of service discontinuance. See 47 U.S.C. § 214(b).